# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANLEY WEINER, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) **CIVIL ACTION NO.** |
| Plaintiff, | ) ) CLASS ACTION ) |
| vs. | ) ) **COMPLAINT FOR VIOLATIONS** |
| HARDINGE INC., J. PATRICK ERVIN, CHARLES R. TREGO, and EDWARD J. GAIO, | ) **OF THE FEDERAL SECURITIES** ) **LAWS** ) |
| Defendants. | ) JURY TRIAL DEMANDED ) ) |

Plaintiff, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation of Plaintiff's counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Hardinge Inc. ("Hardinge" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Hardinge; and (c) review of other publicly available information concerning Hardinge.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of Hardinge's securities between February 22, 2007 and February 21, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Hardinge is a machine tool manufacturer, which designs and manufactures computer-numerically controlled cutting lathes, machining centers, grinding machines, collets, chucks, indexing fixtures, and other industrial products.   The Company's brands include Hardinge, Kellenberger, Bridgeport, and Hauser, Tripet, and Tshudin.   Hardinge has manufacturing facilities in the United States, as well as Switzerland, Taiwan, and China.

3.     On February 21, 2008 Hardinge shocked investors when the Company revealed that in the fourth quarter of the fiscal year ending December 31, 2007, Hardinge experienced a combination of prior period accounting adjustments and the negative impact of operational initiatives to reduce inventory which contributed to an unexpected loss in the fourth quarter of 2007.   Hardinge's fourth quarter and full year 2007 earnings reflected a significant and unexpected reduction in the Company's gross margin as a result of: prior period accounting adjustments related to intercompany profits in inventory elimination and accounts payable which were recorded in the fourth quarter of 2007; the rebalancing of production volumes in the Company's United States and Taiwan production facilities to address current market demand for certain products and to reduce inventory; higher price discounting related to plans to reduce finished machine inventories and accelerate the phase-out of older product lines, and product and channel mix changes.   Moreover, the Company announced plans to lower worldwide inventory by $20 million and to discount inventory of older product lines, both of which would continue to constrain the Company's margins during the 2008 fiscal year.

4.     On this news, the Company's shares declined $4.16 per share, or 25.43 percent, to close on February 21, 2008 at $12.20 per share, on unusually heavy trading volume.

5.     The Complaint alleges that, throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the

Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that Hardinge's orders and sales were slowing; (2) slowing sales were causing Hardinge's inventory of outdated machinery to grow; (3) that the Company failed to timely record an impairment in the value of its inventory; (4) as a result, the Company's financial results were materially inflated; and (5) that the Company lacked adequate internal controls.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, Hardinge is a New York corporation and the Company's principal executive offices are located within this Judicial District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## CLASS ACTION ALLEGATIONS

11.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Hardinge's securities between February 22, 2007 and February 21, 2008, inclusive and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

12.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Hardinge's securities were actively traded on the National Association of Securities Dealers Automated Quotations Market ("NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Hardinge shares were traded publicly during the Class Period on the NASDAQ and as of September 30, 2007, Hardinge had 11,476,916 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Hardinge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

14.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Hardinge; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

16.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PARTIES

17.    Plaintiff Stanley Weiner, as set forth in the accompanying certification, incorporated by reference herein, purchased Hardinge's securities at an artificially inflated price during the Class Period and has been damaged thereby.

18.    Defendant Hardinge is a New York corporation with its principal executive offices located at One Hardinge Drive, Elmira, New York, 14902.

19.    Defendant J. Patrick Ervin ("Ervin") was, at all relevant times, Chairman of the Board of Directors, President, and Chief Executive Officer ("CEO") of Hardinge, until Defendant Ervin resigned from the Company on May 22, 2008.

20.    Defendant Charles R. Trego, Jr. ("Trego") was, at all relevant times, Vice President and Chief Financial Officer ("CFO") of Hardinge, until Defendant Trego resigned his employment from Hardinge in January 2008 effective March 2, 2008.

21.    Defendant Edward J. Gaio ("Gaio") was, at all relevant times, Corporate Controller and Principal Accounting Officer of Hardinge, until his January 7, 2008 appointment as Vice President-Elect and CFO-Elect of the Company, and President and CFO of the Company effective March 2, 2008.

22.    Defendants Ervin, Trego, and Gaio are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Hardinge's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual

Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Hardinge is a machine tool manufacturer, which designs and manufactures, computer-numerically controlled cutting lathes, machining centers, grinding machines, collets, chucks, indexing fixtures, and other industrial products.   The Company's brands include Hardinge, Kellenberger, Bridgeport, and Hauser, Tripet, and Tshudin.   Hardinge has manufacturing facilities in the United States, as well as Switzerland, Taiwan, and China.

### Materially False and Misleading
### Statements Issued During the Class Period

24.     The Class Period begins on February 22, 2007.  On this day, Hardinge issued a press release entitled, "HARDINGE FOURTH QUARTER SALES UP 19% AND EPS MORE THAN TRIPLES THE PRIOR YEAR QUARTER."   Therein, in relevant part, the Company stated:

> - **Fourth quarter net income of $6.2 million, up $4.4 million from    prior year**
> - **Net sales of $326.6 million for 2006, a 13% increase over the prior year**
> - **2006 net income nearly doubled to $14.0 million**
> - **Orders up 23% in fourth quarter and 20% for full year**
>
> Hardinge Inc., a leading provider of advanced material-cutting solutions, today reported increased sales and profitability for the fourth quarter and full year 2006 compared to the same periods in 2005.
>
> Net sales for the fourth quarter of 2006 were $93.4 million, an increase of 19%, compared to $78.5 million of net sales for the fourth quarter of 2005.  Net sales were $326.6 million for 2006, an increase of 13%, compared to $289.9 million for 2005.

Net income for the fourth quarter of 2006 was $6.2 million, or $0.71 per basic and fully diluted share, compared to $1.9 million, or $0.21 per basic and diluted share, in the fourth quarter of 2005. Net income for 2006 was $14.0 million, or $1.59 per basic share and $1.58 per diluted share, compared to $7.0 million, or $0.80 per basic share and $0.79 per diluted share, for 2005.

. . . .

Net sales to customers in all regions increased in the three- and twelve-month periods ending December 31, 2006 compared to the same periods in 2005. The net sales increase for fourth quarter 2006 was driven by growth in the lathe, grinding and milling product lines in virtually all of the Company's major markets. The net sales increase for full year 2006 compared to 2005 was driven primarily by growth in the lathe and grinding product lines in virtually all of the Company's major markets.

. . . .

Orders for the three months ended December 31, 2006 were $86.5 million, an increase of 23%, compared to $70.2 million in the same period in 2005. Orders for 2006 were $347.9 million, an increase of 20%, compared to $290.4 million in 2005. The Company's consolidated backlog at December 31, 2006 was $99.6 million, compared to an adjusted backlog of $78.2 million at December 31, 2005.

Gross profit for the three months ended December 31, 2006 was $29.6 million, an increase of $3.6 million or 14%, compared to the same period in 2005. Gross profit for full year 2006 was $100.2 million, an increase of $9.9 million or 11%, compared to 2005. Gross profit increased primarily due to higher net sales. Gross margin for the three- and twelve-month periods ended December 31, 2006 was 31.7% and 30.7% of net sales, respectively, compared to 33.1% and 31.1% for the same periods in 2005. The reduction in gross margin for 2006 resulted from differences in product mix, market mix, and distribution channel.

Selling, general, and administrative (SG&A) expenses were $21.3 million for fourth quarter 2006, a decrease of $1.4 million or 6%, compared to $22.7 million for the same period in 2005. SG&A expense as a percentage of net sales was 22.8% for fourth quarter 2006, down from 28.9% in 2005. SG&A expenses were $77.1 million for 2006, an increase of $2.3 million or 3%, compared to $74.7 million in 2005. SG&A expense as a percentage of net sales

was 23.6% in 2006, down from 25.8% in 2005. SG&A expense as a percentage of sales continues to decrease as the company is able to leverage against increased sales volume. The primary drivers for the SG&A increase for 2006 compared to 2005 were volume-related commission expense and selling and marketing expenses, partially offset by a reduction to bad debt expense.

. . . .

In December 2005, the Company acquired the remaining 49% interest in Hardinge Taiwan Precision Machinery Limited, which is treated as a consolidated subsidiary. As a result of this transaction, there is no minority interest reduction to consolidated net income in 2006 compared to a reduction $0.9 million and $2.5 million, respectively, for the three and twelve month periods ended December 31, 2005.

(Emphasis in original).

25.    On March 16, 2007, Hardinge filed its Annual Report with the SEC on Form 10-K for the 2006 fiscal year.  The Company's 10-K was signed by Defendants Ervin, Trego, and Gaio, and reaffirmed the Company's financial results announced on February 22, 2007.  Therein, in relevant part, the Company stated:

> *Inventories.*   The Company uses a number of assumptions and estimates in determining the value of its inventory. An allowance is provided for the value of inventory quantities of specific items that are deemed to be excessive based on an annual review of past usage and anticipated future usage. While the Company feels this is the most appropriate methodology for determining excess quantities, the possibility exists that customers will change their buying habits in the future should their own requirements change. Changes in metal-cutting technology can render certain products obsolete or reduce their market value. **The Company continually evaluates changes in technology and adjusts its products and inventories accordingly, either by write-off or by price reductions**. However, the possibility exists that a future technological development, currently unanticipated, might affect the marketability of specific products produced by the Company.

(Emphasis added).

26.     The Company's 10-K filed on March 16, 2007 also contained Sarbanes-Oxley required certifications, signed by Defendants Ervin and Trego, who certified:

1.      I have reviewed this annual report on Form 10K for the period ended December 31, 2006 of Hardinge Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

    a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

27.    On April 3, 2007 Hardinge issued a press release where, contrary to the Company's prior practice of not providing investors with forward guidance, Hardinge provided guidance for the 2007 fiscal year. Therein, the Company, in relevant part, stated:

**Outlook**

In February, Hardinge announced 2006 results including record net sales of $326.6 million, net income of $14.0 million and a 20 percent increase in orders for the full year. During 2007, Hardinge expects net sales to be in the range of $330.0 to $340.0 million and net income to be in the range of $15.0 to $17.0 million . . . . The

Company does not intend to provide further comment or updates
on the outlook for net sales or net income for 2007.

(Emphasis in original).

28.    On May 10, 2007 Hardinge issued a press release entitled, "Hardinge EPS Up
173% In First Quarter 2007; Orders Increase By 25% Over Prior Year Quarter." Therein, the
Company, in relevant part, stated:

> - **Orders were up 25% to $95.6 million compared to first
>   quarter 2006**
> - **Net sales increased by 15% to $87.0 million compared with
>   the prior year**
> - **Net income increased by 173% to $5.3 million**
> - **Operating margin of 10.3% up from 4.8% in prior year
>   quarter**
>
> Hardinge Inc., a leading international provider of advanced
> material-cutting solutions, today reported increased orders, net
> sales, net income and EPS during the first quarter of 2007,
> compared to the same quarter in 2006.
>
> Net sales were $87.0 million in the first quarter of 2007, an
> increase of 15% compared to $75.4 million of net sales in the first
> quarter of 2006. Net income was $5.3 million, or $0.61 per basic
> share and $0.60 per diluted share, compared to $1.9 million, or
> $0.22 per basic and diluted share in the first quarter of 2006.
> Orders were $95.6 million, an increase of 25%, compared to $76.7
> million in the first quarter of 2006.
>
> . . . .
>
> North American orders were positively influenced by a $4.9
> million order for grinding machines for use in turbine blade
> manufacturing.  Without this order the North American market
> would have been relatively flat for the quarter. European market
> orders were driven by continued strong demand for all products.
> Asia & Other orders were negatively impacted by a biannual trade
> show held in April 2007 in China, which resulted in our Chinese
> customers holding orders until the trade show. We anticipate these
> orders will be placed in the second quarter of 2007.
>
> . . . .

Our 41% increase in European net sales was driven by continued strong regional demand for our turning and grinding products. In total, Asia & Other net sales increased by 5% for the quarter; however, excluding the sales of special grinding machines used in turbine blade manufacturing to one customer in both the first quarter of 2006 and 2007, net sales in Asia and Other increased 18%. North American net sales were down in the quarter because of reduced demand for grinding and milling products, which was partially offset by growth in turning products.

Net sales for the first quarter of 2007 were positively impacted by $3.4 million related to the favorable effects of net foreign currency translation, almost entirely due to the changes between the value of the U.S. dollar versus the Swiss franc, euro and British pound.

Gross profit was $28.0 million, or 32.2% of net sales, compared to $22.9 million, or 30.4% of net sales in the first quarter of 2006. The increase in gross profit was primarily due to the increase in net sales. The increase in gross margin percentage resulted from changes in channel and product mix. Gross profit for the first quarter of 2007 was positively impacted by $0.9 million related to the favorable effects of net foreign currency translation.

(Emphasis in original).

29.    In the May 10, 2007 press release, Defendant Ervin, in relevant part, stated:

Hardinge continues to build on its solid 2006 performance . . . . A strong 25% increase in orders and 15% increase in sales provided an encouraging start to the year. As a result of the continued execution of our focused growth strategy, we realized significant improvement in our operating and net margins for the quarter. And, we successfully raised more than $55 million in new capital, positioning the company to continue to build on its strong global manufacturing and sales presence.

30.    On May 10, 2007 Hardinge held a conference call with analysts to discuss the Company's fiscal first quarter 2007 financial results announced in the May 10, 2007 press release. Therein, the Company and certain Individual Defendants, in relevant part, stated

[Defendant Ervin:]

Our order rate in Europe improved significantly in the first quarter of 2007 when compared to last year. Our orders in Europe were up

39% for the quarter, compared to the first quarter of 2006. This growth in orders was driven by increased orders in each of our main product lines. Overall business levels in Europe remained strong.

Our order rate in Asia and Other was also stronger in the first quarter. Although our order rate in these regions were up 8.0% for the first quarter of last year, we believe our orders from China for the first quarter were artificially lower due to a large biannual tradeshow held in China in April. We believe customers postponed placing orders until visiting the show. Because of this, we anticipate stronger orders from China during the second quarter now that the show is complete.

Reviewing our sales performance geographically, sales in North America were down 5.0% in the first quarter, compared to last year's first quarter results. This decrease was driven by two factors.

**First, we have moved from a distributor sales force in Canada to a direct sales force and are currently in process of setting up our direct operation in Canada.** We fully expect our direct operation to result in an increased market share for our products in the Canadian market, however it'll take some time to rebuild our penetration in this market. We plan to aggressively pursue sales of our products in the Canadian market.

**The second factor is some of our U.S. distributors increased their inventory levels in 2006 to support anticipated continued growth in the North American market. As this market growth is slowed, distributors have lowered their target inventory levels, resulting in delayed shipments of replacement inventory from Hardinge. This is a onetime event that will result in resumed shipments to distributors once targeted inventory levels are reached**.

**Both of these factors are temporary and we anticipate the North America market will remain steady throughout 2007**.

* * *

[Bob Schenoski - Analyst:]

Okay and do we expect to see a change of working capital as well in the second quarter?

. . . .

[Defendant Ervin:]

I would say, at this point, the second quarter, we built up inventory, as you can see. We built up inventory as a result of some new products that we've come out with to be a position worldwide to move them through the structure, the organization we have. I think it'd be premature to say that until we see how they sell compared to the run rate of what we've set up in inventory. I think we'll have a much better position on that after the second quarter to see how they're moving.

(Emphasis added).

31.     On May 10, 2007 Hardinge filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal first quarter. The Company's 10-Q was signed by Defendants Ervin, Trego, and Gaio, and reaffirmed the Company's financial results announced on May 10, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Ervin and Trego, substantially similar to the certifications contained in ¶26, supra.

32.     On August 9, 2007 Hardinge issued a press release entitled, "Hardinge Increases Earnings by 99% over Second Quarter 2006." Therein, the Company, in relevant part, stated:

**Performance Highlights Compared to Second Quarter 2006:**
- **Net sales increased 14.3% to $89.7 million**
- **Net income increased 99.0% to $6.0 million**
- **Diluted Earnings per share up 67.6% to $0.57**
- **Operating margin of 9.6% up from 6.8%**
- **Debt to total capitalization decreased from 34.8% to 10.2%**
- **Interest expense reduced 45.5% to $0.7 million**

Hardinge Inc., a leading international provider of advanced material-cutting solutions, generated increases in net sales, net income and EPS during the second quarter of 2007, compared to the same quarter in 2006.

The company produced net income of $6.0 million during the second quarter of 2007, or $0.57 per diluted share, compared to the $3.0 million, or $0.34 per diluted share, it earned in the second quarter of 2006. There were 1.8 million more weighted average shares outstanding in 2007, following the company's secondary stock offering, completed in April 2007. Net income for the first

six months of 2007 was $11.3 million, or $1.18 per diluted share, compared to $5.0 million, or $0.56 per diluted share, for the first six months of 2006.

Hardinge grew net sales by 14.3% in the second quarter of 2007 to $89.7 million, compared to the $78.5 million it sold in the year-ago quarter. Its net sales for the first six months of 2007 rose by 14.8% to $176.7 million, compared to $154.0 million in the first six months of 2006.

. . . .

North American orders decreased due to lower market demand for machine tools as well as the company's decision to terminate several distributors as part of a restructuring process of our North American sales channels. Although our restructuring actions affected second quarter orders by approximately $3 million and year-to-date orders by about $5 million, we are confident that these changes will strengthen our long-term competitive position in North America. We continue to evaluate and work with our current worldwide distribution partners to make sure the business strategies, product offerings and operational performance are acceptable to both parties. If necessary, additional changes to our distribution network throughout the world will be made to ensure Hardinge has the best opportunity to partner with our customers to grow our business. European orders increased mainly due to continued strong market demand throughout the region, especially for grinding product lines. The decrease in "Asia & Other" orders was primarily due to unusually large orders in the second quarter of 2006 for high-end grinding machines. The Chinese markets remained robust, producing an order increase of 27%.

. . . .

Hardinge grew North American sales primarily through the increased sales of lathe product. Sales in Europe increased as a result of strong machine tool market growth, specifically for the company's grinding products. Sales in "Asia & Other" were flat, reflecting a 25% increase in Asia which was offset by a 65% decrease in "Other" in the current quarter. On a year-to-date basis, sales in the "Other" category were down 48% compared to the same period last year. These decreases were driven by the lower shipments of specialty grinding machines.

The strengthening of foreign currencies relative to the U.S. dollar caused a favorable impact of $1.7 million and $5.0 million on net

sales for the three and six months ended June 30, 2007, compared to the same periods in 2006.

Gross profit was $29.3 million, or 32.6% of net sales, compared to $23.6 million, or 30.0% of net sales, in the second quarter of 2006. For the first six months of 2007, gross profit was $57.3 million, or 32.4% of net sales compared to $46.5 million, or 30.2% of net sales, for the first six months of 2006. These increases are mainly due to higher sales, with the gross profit margin increases stemming from changes in channel and product mix. Stronger foreign currencies relative to the U.S. dollar favorably impacted gross profit by $0.6 million and $1.5 million during the three and six months ended June 30, 2007, compared to the same periods in 2006.

(Emphasis in original).

33.     In the August 9, 2007 press release, Defendant Ervin, in relevant part, stated:

Hardinge once again produced solid growth in sales, margins and earnings in the second quarter compared to the same period last year. . . . From an orders perspective, strong growth in European and Chinese orders was offset by softness in the North American region, coupled with non-repeating orders for specialty grinding products in 'Asia & Other.' In addition to our strong financial performance, we raised $55.9 million in new capital during the quarter through a successful follow-on stock offering, positioning Hardinge to continue building upon its strong global manufacturing and sales presence.

* * *

We are very pleased that the investment community is taking greater notice of Hardinge, which is a goal we've collectively been working toward for some time now . . . . We look forward to capitalizing on the momentum we've achieved in this area, and hope to gain additional analysts who see opportunity in the global machine tool industry.

34.     On August 9, 2007 Hardinge held a conference call with analysts to discuss the Company's fiscal second quarter 2007 financial results announced in the August 9, 2007 press release. Therein, the Company and certain Individual Defendants, in relevant part, stated:

[Defendant Ervin:]

North American orders were negatively impacted by a number of factors. First the North American market has slowed down with the market weaker in the second quarter of 2007 when compared to the second quarter of 2006. **On a positive note, we have seen customer interest in new machines increase over the last few weeks. We are hopeful this is a start to a stronger second half of the year for orders from North America. Second, we are restructuring our North American sales channel to improve our penetration into the market. As part of this restructuring, we were adding additional direct sales people to focus on new accounts. In addition, we have been working closely with our distributors to expand and strengthen their organizations as well**.

**As part of this restructuring, we reaffirmed our business strategy and product strategy remain in alignment with the goals of our distributors**. As we performed this work, it was necessary to terminate two distributors who were covering the southeast region of the U.S. market and one distributor covering Ohio. These terminations were driven by a number of factors. However one key factor we constantly monitor is our ability to penetrate a market with new products. New products are the life blood of our company as we continue to add more products to our product offering, we may run into the situation where sales in a region are limited because of competitive product offerings that one of our distributors is carrying. This situation is not acceptable to us and a solution that allows us to be successfully-- to successfully sell our products in that region is developed when it occurs. These distributor changes in the U.S. were on top of the termination of our distributor earlier this year in Canada.

Moving forward, we are now covering Canada and Ohio on a direct sales basis and we have partnered with new distributors to cover the southeast region of the U.S. Unfortunately by changing sales coverage in a region, orders are negatively impacted in the short-term as it takes time to get new sales personnel up to speed from both a product training and customer perspective. We are absolutely convinced these changes in sales coverage will be very positive in terms of our ability to generate incremental orders in the long term.

Our order rate in Europe improved significantly in the second quarter of 2007 when compared to last year. Our orders in Europe were up 26% for the quarter and 33% year to date when compared to the same periods in 2006. This growth in orders continues to be driven by strong business levels throughout Europe.

. . . **I would also like to comment on the increase in our inventory levels during the first six months of 2007. As I mentioned in our last conference call, we introduced new products that required filling the pipeline to our markets. The majority of this increase is in the form of finished goods. In addition, the increase in pipeline-- to the increase in pipeline inventory, we made a business decision not to reduce production as the North American market slowed. We want to be in a position to react quickly to customer demands as we increase our sales as a result of the restructuring of our North American sales force.** We will continue to monitor market demand and adjust production accordingly. An event that will occur in the industry in September is the EMO International Trade Show that will take place in Hannover, Germany. This show occurs every two years and will give our company a chance to highlight our broad product offering to European as well as worldwide customers. We look forward to having a good show.

\* \* \*

[Defendant Trego:]

Increased gross profit is primarily due to the increase in sales levels Pat [Ervin] discussed earlier, changes in channel mix and improved product mix . . . .

. . . **An item to note that significantly reduced our net cash provided from operating activities in the first half of 2007 was our $19 million increase in inventories. Two-thirds of the inventory increase in the first half of 2007 occurred in the North American region and resulted from several factors that Pat [Ervin] discussed in his earlier comments**.

\* \* \*

[Bob Schenoski - Analyst:]

Okay, but you are seeing the U.S. pick up as you noted?

[Defendant Ervin:]

**Yes, I mean right now it's a little early to tell in the quarter but we have seen definitely stronger interest activity from customers over the last three or four weeks as I said**.

\* \* \*

[Harris Hall - Analyst:]

And can you elaborate a little bit more on the inventory situation? I didn't catch all of that.

[Defendant Ervin:]

**Sure. I mean in inventory there was really a couple key drivers to it. One was the fact that we continued to introduce new products and as I said last call, just to fill the pipelines with those throughout the world is going to drive some increase in finished goods inventory. But the second one was a conscious decision where we knew we're restructuring the North American market. We knew we were strengthening our sales force in that market. And we did not or we elected not to slow down production for products that would come to North America. So you had the market slowdown, so inventories would have grown. The natural thing we would have done historically is to say okay, start bringing back production in those areas targeted at North America. And we elected not to do that.**

**I do feel strong that if we continue to strengthen our sales channels in North America, we will be in a position to utilize that inventory most of it needed on a very quick delivery basis for customers to augment our sales in this market. So this is a case where if our sales force is successful increasing new accounts and penetrating the market, we will be able to move that inventory in North America as well as throughout the world. And we're really counting on we want to be in a position to be able to give that quick delivery to the market.**

Now as I said in my prepared statement, obviously we're going to watch the markets and if we are seeing things improve, we'll make appropriate adjustments to production levels in our factories throughout the world.

\* \* \*

[Brian Ram - Analyst:]

. . . [Can you] comment on what Sarbanes-Oxley is costing you?

. . . .

[Defendant Ervin:]

> Now when you look at Sarbanes-Oxley, I mean I believe we've
> gotten to the point now that it's our what-- third year I think we've
> gone through Sarbanes-Oxley. We're on our fourth right now.
> We've got our internal procedures in pretty good shape . . . .

(Emphasis added).

35.    On August 9, 2007 Hardinge filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal second quarter. The Company's 10-Q was signed by Defendants Ervin, Trego, and Gaio and reaffirmed the Company's financial results announced on August 9, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Ervin and Trego, substantially similar to the certifications contained in ¶26, supra.

36.    The statements contained in   ¶¶24-35 were materially false and/or misleading when made because defendants failed to disclose and/or indicate the following: (1) that Hardinge's orders and sales were slowing; (2) slowing sales were causing Hardinge's inventory of outdated machinery to grow; (3) that the Company failed to timely record an impairment in the value of its inventory; (4) as a result, the Company's financial results were materially inflated; and (5) that the Company lacked adequate internal controls.

### The Truth Begins to Emerge

37.    On November 8, 2007 Hardinge issued a press release entitled, "Hardinge Increases Third Quarter Net Sales and Earnings." Therein, the Company, in relevant part, stated therein:

> **2007 Performance Highlights:**
> • **Net sales in the third quarter increased 6% over 2006 to $83.7 million**
> • **Net income in the third quarter increased 35% over 2006 to $3.7 million**
> • **Nine month net income increased 95% to $15.0 million**
>
> Hardinge Inc., a leading international provider of advanced material-cutting solutions, generated increases in net sales, net

income and earnings per share during the third quarter and nine months ended September 30, 2007 compared to the same periods in 2006.

The company increased third quarter net income to $3.7 million, a 35% improvement over third quarter 2006. Third quarter results included an increase in net income due to a $1.4 million gain on the sale of an asset and a decrease in net income resulting from a decrease in net foreign exchange gain of $1.2 million. Earnings per diluted share were $0.32 for the quarter, up $0.01 or 3% over third quarter 2006. This reflects 2.6 million additional weighted average shares outstanding in the third quarter of 2007, a result of the company's successful follow-on common stock offering in April 2007.

Hardinge increased its net income for the first nine months of 2007 by 95% to $15.0 million, compared to $7.7 million for the comparable period in 2006. Net income for the first nine months included this same asset sale gain of $1.4 million, as well as a $0.3 million decrease in net income resulting from a reduced net foreign exchange gain. Diluted earnings per share for the first three quarters of 2007 were $1.46, an increase of 66% over the prior year. Weighted average shares outstanding for the nine months ended September 30, 2007 were 10.3 million, an increase of 1.5 million shares over the 2006 period.

. . . .

Orders for the third quarter were $83.4 million; a decrease of $8.8 million or 10% compared to the third quarter of 2006. Orders for the nine months ended September 30, 2007 were $265.0 million, an increase of $3.7 million or 1% compared to the first nine months of 2006.

North American orders decreased during the third quarter and year-to-date 2007 when compared to the prior year primarily because 2006 included a significant portion of orders received at the International Manufacturing Technology Show held every other year during September, coupled with a softer economic environment in North America.

European orders decreased 3% during the third quarter of 2007 compared to a strong third quarter in 2006, although year to date orders in Europe increased 19%. Since the third quarter of 2006, Hardinge has experienced a significant increase in its European order levels driven by strong demand for machine tools. For the

last five quarters, European orders have averaged $41 million per quarter, up more than 30% over the average of the five quarters which preceded that. Although Hardinge did receive very good interest during EMO, the biennial international machine tool show held in Germany this past September, the company did not experience an immediate upswing in orders from the show since most orders will be processed through distributors versus directly with Hardinge. Distributor orders generally are delayed to the manufacturer, as distributors may fill orders from their own stock of inventory before ordering new replacement machines. Hardinge anticipates continued strong orders from Europe well into 2008.

"Asia and Other" orders increased 1% for the quarter and decreased 8% on a year-to-date basis. The primary driver to reduced order performance on a comparable basis has been uneven demand patterns in the regions outside of China. On a year-to-date basis, excluding the impact of a single, large $6.0 million turbine blade grinder order in 2006, "Asia and Other" would have increased 3%.

. . . .

Net sales for the quarter were $83.7 million, an increase of $4.4 million or 6% compared to the third quarter of 2006. Net sales for the nine months ended September 30, 2007 were $260.4 million, an increase of $27.2 million or 12% compared to the nine months ended September 30, 2006.

The increase in North American net sales for the third quarter and year-to-date in 2007 compared to the same periods in 2006 resulted from a strong demand for grinding products offset by a reduction in turning products.

The European increase in net sales stems from continued strong growth in all product categories during both the quarter and year-to-date in 2007.

A significant portion of the decrease in net sales in "Asia and Other" is the result of non-recurring shipments of $5.9 million for the third quarter and $10.1 million year-to-date of specialty machines, which shipped in 2006 and did not repeat in 2007. Excluding the impact of these specialty shipments, net sales in the third quarter of 2007 compared to 2006 would have decreased $2.5 million, while on a year-to-date basis net sales would have increased $2.5 million. The company's backlog in China has increased by $4.6 million since the end of the first quarter of 2007

due to tighter import restrictions by the Chinese government, which is attempting to encourage a greater use of products manufactured within their country. The company had hoped to offset any decrease in Chinese imports with increased shipments from its Chinese production facility. However, production output has not grown as quickly as anticipated, due to select supply chain issues, coupled with longer than anticipated start-up training for new employees. Despite this, Hardinge believes it is making good progress eliminating these production bottlenecks and anticipates production reaching its planned levels in the first quarter of 2008.

. . . .

The strengthening of foreign currencies relative to the U.S. dollar caused a favorable translation impact of $3.1 million and $8.1 million, respectively, on net sales for the three and nine months ended September 30, 2007 over the same periods in 2006.

Hardinge improved its gross profit by 9% to $26.2 million for the third quarter compared to its year-ago quarter, and raised its gross margin to 31.3% of sales, compared to 30.3% a year ago. Gross profit for the nine months ended September 30, 2007 increased 18% to $83.4 million or 32.0% of net sales, compared to $70.5 million, or 30.2% of net sales for 2006. These improvements continue to be driven by higher sales, as well as changes in channel and product mix. Stronger foreign currencies relative to the U.S. dollar favorably impacted gross profit by $0.9 million and $2.4 million, respectively, during the three and nine months ended September 30, 2007, compared to the same periods in 2006.

(Emphasis in original).

38.    In the November 8, 2008 press release, Defendant Ervin, in relevant part, stated:

Our products today are some of the strongest, most capable products available anywhere in the world, and getting those products in the hands of customers is what will drive our continued growth in both the short- and long-term. We are not satisfied with new order levels in certain key markets, and are taking steps to strengthen our various sales and product distribution channels.

* * *

Our key initiative at Hardinge is to continue growing our company by expanding our geographic reach and customer base from a sales and marketing perspective. We currently have the product portfolio to support our growth goals. However, most potential

customers are not aware of what the new Hardinge group of companies can offer them. To address this situation we will continue to invest in strengthening our marketing efforts and our worldwide sales and distribution network.

39.    On November 8, 2007 Hardinge held a conference call with analysts to discuss the

Company's fiscal third quarter 2007 financial results announced in the November 8, 2007 press

release. Therein, the Company, in relevant part, stated:

[Defendant Ervin:]

Order growth in the third quarter of 2007 was down 10% when compared to the third quarter of 2006. On a year-to-date basis, order growth was up 1% when compared to 2006. To understand the drivers of our changes in orders, we must look at changes by region. North American orders decreased during the third quarter in year-to-date 2007 when compared to the prior year, primarily because 2006 included a significant portion of orders received at the International Manufacturing Technology Show held every other year during September. In addition, we are experiencing a somewhat softer economic market in the North American market. We recognize to grow our business in the current softer market requires increased market penetration. **We plan to accomplish this by significantly increasing the number of feet on the streets selling our products**.

. . . .

Although we received very good interest in our products this past September during EMO, the European International Machine Tool Show held every two years, we did not experience an immediate upswing in orders from the show. Unlike orders received during IMTS in 2006, most orders generated from EMO will be processed through distributors versus direct with Hardinge. Distributor orders are generally delayed to the manufacturer as distributors may fill orders from their own stock of inventory before ordering new replacement machines from a manufacturer. **Although we anticipate continued strong orders from Europe throughout 2008, we are also implementing initiatives to significantly strengthen our marketing and sales efforts throughout Europe**.

. . . .

To better understand the drivers of our changes in sales, we must again examine the changes by region. **Sales improvements in North America and Europe were offset by lower net sales in Asia and other regions in the third quarter and year-to-date for 2007 compared to 2006. The 6% increase in North American net sales for the third quarter and year-to-date in 2007 compared to the same periods in 2006 resulted from a strong demand for grinding products offset by a reduction in demand for turning products**. The increase in European sales of 41% for the third quarter and 34% year-to-date compared to the same period in 2006 stems from continued strong growth in all product categories throughout the region. Net sales in Asia and other were down 37% for the third quarter and 13% to date 2007 when compared to the same period in 2006. A significant portion of the change in net sales in Asia and others is the result of shipment of specialty machines that occurred in 2006. Shipment of these specialty machines in 2006 totaled $5.9 million for the third quarter and $10.1 million on a year-to-date basis. We had no shipment of these specialty machines in the Asia and other regions in 2007. Excluding the impact of these specialty shipments, net sales for the third quarter of 2007 compared to 2006 would have decreased $2.5 million and increased $2.5 million on a year-to-date basis.

**An issue inhibiting our shipments in the Asian and other region is tighter import restrictions by the Chinese government**. The China government continues to encourage customers to purchase locally produced machines by making it more difficult to obtain import licenses, denying duty free import status for machine imports, and making it more difficult to obtain financing for letter of credit sales. Although these tactics are not new, they are becoming more difficult to overcome for our customers. These tactics are exactly why we elected to begin producing machines in China in the first place. **We had hoped to offset any decrease in China imports with increased shipments from our Chinese production facility. However, our production output is not growing as fast as we anticipated. Our production increases have been hampered by select supply chain issues, coupled with longer than anticipated start-up training for new employees**. We are making good progress eliminating these production bottlenecks and anticipate production reaching its planned level in the first quarter of 2008. The combination of these issues has unfortunately limited our shipments in the China market and our backlog in China has increased by $4.6 million since the end of the first quarter of 2007.

\* \* \*

[Defendant Trego:]

**And now, I'd like to make a comment on our inventories. Our inability to generate improved cash flow in the first nine months of 2007 from operating activities has been directly tied to our increase in inventories of $26.3 million. The vast majority in this increase is in the form of finished goods machines available for immediate delivery, the unfortunate result of lower than planned orders and shipment performance that Pat [Ervin] discussed earlier that's resulted in continuing increase in inventories. We have resized our production areas to start drawing inventory levels down, but the real success in inventory reduction will come from increasing the growth in orders and shipments, which we are fully focused on as a Company.**

\* \* \*

[Brandon Osten- Analyst:]

Sure. In terms of the delays that you guys are saying like with regards to the distributors taking orders, but not necessarily reflecting [it in for the year], have you guys seen any -- do you have a sense of how much of an effect that might have been or do you guys go out on calls for new orders from distributors --?

[Defendant Ervin:]

I mean, our distributors are placing new orders in Europe, but it is normal business. The reason I'll expand on that a little further is you have to remember, in a European show, you get customers obviously from all regions, so whether it be -- the show happened to be held in Germany here, but -- this year, but obviously you get Italy, Spain, Switzerland, France. So, what happens is those distributors who cover a region are usually not there to deal with at the booth. Okay? So what will happen is those people will go back and think about it and then contact their local distributor. So, depending on how successful they are closing orders, and as I said whether the distributors take it out of their stock or not, is the types of impacts. Whereas in the U.S., you're usually dealing mainly with U.S. customers and in many cases, the direct sales force or the distributor sales force that's right there at the show and they can negotiate and close the order at the show. That's what I really meant by the difference. There is little negotiation actually done on

the floor when you are dealing with people from outside of the region.

\* \* \*

[Bob Schenoski - Analyst:]

. . . I know you had some big numbers in the fourth quarter last year and I know you are not excited about giving expectations other than what you have already given, but how should we in general terms think about 4Q? I mean are we looking for a huge degradation or --

[Defendant Ervin:]

. . . I know you know the answer to that and I am not going to provide guidance. I am not going to confirm anything because that's guidance. We will be coming out obviously with 2008. We are doing our business planning process now that I present to the Board in about three weeks and then we will be able to share some guidance. **I still look at business around the world as being very strong.**

\* \* \*

[Sheldon Grodsky - Analyst:]

. . . **Your backlog has declined in the last two quarters. You guys seem to have some unplanned -- I don't mean to editorialize here but some unplanned inventory increase and [you are saying] business is very strong. What's wrong with this picture? Have you hit some selling problems or is --**

[Defendant Ervin:]

. . . The -- when I look overall, we have a bunch of new products that were coming in the fold that we anticipated would be, I'll call it accepted by the market at higher rates than they are. Now, they are higher performance products in many cases, and as a result getting people to truly understand what's going on is -- what they are used for is really -- is key, so they are not a quick sale, let me say it that way. Now, what we have done though is in the areas where there is quick sales is what we would call in our standard products throughout the world, and we have now built that up probably to a higher level anticipating quicker roll for turn-on in inventory. **Now, I have to go back -- even though we don't**

**comment on backlog -- I'm not sure how you got to the assumption that backlog has dropped because I don't think that is the case when you go back just to --**

[Sheldon Grodsky - Analyst:]

**Sir, can I just interject for a moment to tell you that my very sophisticated technique. Orders have been less than shipments for two consecutive quarters if my --**

[Defendant Ervin:]

**Right.**

[Sheldon Grodsky - Analyst:]

**So that's -- usually the difference is it's acquired backlog.**

[Defendant Ervin:]

**Okay, that's right,**

. . . **So, the good news is as we build the sales force up, we got the product sitting there now as finished goods inventory. And as I think Chuck had mentioned earlier in the call, the real issue -- yes, we are scaling back production, so we are not building additional, but the real issue is getting the sales force effective so that we can start turning that inventory and turning it into cash and supporting growth of the future.**

\* \* \*

[Defendant Ervin:]

. . . **I can tell you we have some distributors in North America that we are very pleased in how they're working with us and how they're adding resources, and we're going to continue to use those distributors, as long as they perform. Now, I have to say this, I feel the same way about direct salesman. A direct salesman, in fact their direct story is to perform. So, if a direct salesman isn't performing, they will be replaced with another direct salesman and that's worldwide. The one thing I've always said in my career and it's unfortunate, but the easiest thing in the world to measure is the effectiveness of sales because either you get the sale or you don't, and the (inaudible) doesn't matter.** So, we are very strong in all of our sales channels

> at the moment to recognize our ability to supply product in any
> region in the world, is far in excess of what we're getting out of
> that region in the world today with respect to orders and shipments,
> just because our product line is so broad with all our different
> brands.

(Emphasis added).

40.     On this news, the Company's shares declined $7.67 per share, or 25.61 percent, to close at $22.28 per share on November 8, 2007, on unusually heavy trading volume.

41.     On November 9, 2007 Hardinge filed its Quarterly Report with the SEC on Form 10-Q for the 2007 fiscal third quarter. The Company's 10-Q was signed by Defendants Ervin, Trego, and Gaio, and reaffirmed the Company's financial results announced on November 9, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Ervin and Trego, substantially similar to the certifications contained in ¶26, supra.

42.     The statements contained in   ¶¶37-39 and 41 were materially false and/or misleading when made because defendants failed to disclose and/or indicate the following: (1) that Hardinge's orders and sales were slowing; (2) slowing sales were causing Hardinge's inventory of outdated machinery to grow; (3) that the Company failed to timely record an impairment in the value of its inventory; (4) as a result, the Company's financial results were materially inflated; and (5) that the Company lacked adequate internal controls.

43.     On January 8, 2008 Hardinge issued a press release entitled, "Hardinge Announces Resignation Of Its Chief Financial Officer And Appointment Of Successor." Therein, the Company, in relevant part, stated:

> Hardinge Inc., a leading international provider of advanced
> material-cutting solutions, today announced the resignation of
> Charles R. Trego, Jr. as Senior Vice President and Chief Financial
> Officer effective March 2, 2008. He has served in this position
> since October 2005. Mr. Trego has resigned to accept the position
> of Executive Vice-President and Chief Financial Officer with

another publicly held company outside of the machine tool industry.

### Disclosures at the End of the Class Period

44.     On February 21, 2008 Hardinge issued a press release entitled, "Hardinge Reports Fourth Quarter and Full Year Results." Therein, the Company, in relevant part, stated:

**2007 Performance Summary**
- **Fourth quarter orders increased 10% over prior year quarter**
- **Fourth quarter net loss of ($0.1) million compared to net income of $6.2 million in fourth quarter 2006**
- **Net sales of $356.3 million for 2007, a 9% increase over the prior year**
- **Net income of $14.9 million for 2007, up 7% compared to 2006**
- **Board of Directors authorizes up to $10 million share buyback**

Hardinge Inc., a leading global provider of advanced material-cutting solutions, today announced net sales of $96.0 million for the fourth quarter of 2007, an increase of $2.5 million or 3%, compared to $93.4 million for the fourth quarter of 2006. Net sales for the full year were $356.3 million, a $29.7 million or 9% increase over 2006 net sales of $326.6 million.

Net loss for the fourth quarter of 2007 was ($0.1) million, or ($0.01) per basic and diluted share, compared to net income of $6.2 million, or $0.71 per basic and diluted share, in 2006. Fourth quarter 2007 net loss was impacted mainly by a significant reduction in gross margin, coupled with an accounting adjustment related to prior years, that will be discussed below. Net income for 2007 increased by 7% to $14.9 million compared to $14.0 million for 2006. Diluted earnings per share were $1.41 for 2007, compared to $1.58 for 2006. Weighted average shares outstanding for 2007 were 10.6 million, up 20% in comparison to 2006 resulting from the Company's follow-on stock offering in April 2007.

. . . .

Orders for the three months ended December 31, 2007 were $95.6 million, an increase of 10%, compared to $86.5 million in the same

period in 2006. Orders for 2007 were $360.5 million, an increase of 4%, compared to $347.8 million in 2006.

North American orders for the fourth quarter increased by 18%, in comparison to 2006, reflecting higher demand for turning products. North American orders for 2007 were down 6% compared to the prior year.

European orders were up for both the quarter and the full year. Fourth quarter 2007 orders increased $4.1 million or 10% over 2006, driven by strong demand for all products coupled with a positive impact of currency translation of $3.3 million. European orders for the full year increased $24.0 million or 16% for 2007 and remained strong throughout the year averaging more than $42 million per quarter. Approximately $5.6 million of the full year growth in orders can be attributed to foreign currency translation changes. At $170.9 million, European orders accounted for nearly half of the Company's total order activity during 2007.

'Asia and Other' orders increased 2% during the fourth quarter, in comparison to 2006.  Order activity for the full year was down by 5% reflecting the impact of several large orders for automotive and turbine blade grinding applications from 2006 that did not recur in 2007.

. . . .

Net sales of $96.0 million for the fourth quarter of 2007 increased by $2.5 million or 3% compared to $93.4 million for the fourth quarter of 2006. This sales increase includes a $5.0 million favorable impact as a result of currency translation. Without the currency impact, sales for the quarter would have been down $2.5 million or 2.6% from the fourth quarter of 2006. Net sales for the full year were $356.3 million, a $29.7 million or 9% increase over 2006 sales of $326.6 million. However, this sales increase includes a $13.1 million increase in sales as a result of currency translation. Without the currency impact, sales for the year would have increased $16.6 million or 5% for the full year compared to 2006.

For 2007, net sales growth was driven by increases in sales of both our grinding and turning products, with continental Europe being the strongest market.  For the year, two-thirds of total net sales were to customers outside of North America.

Gross profit for the three months ended December 31, 2007 was $24.0 million or 25.0% of sales, a decrease of $5.7 million, or

19%, compared to $29.6 or 31.7% of sales for the same period in 2006.

Without the impact of accounting adjustments relating to prior periods, gross margin percentage would have been 27.0% for the quarter (versus 25%). The net effect of the adjustments related to prior periods was not material to net income for any of the prior periods and not significant in the aggregate to net income for the 2007 full year.

The remaining impact on gross margin in the fourth quarter is primarily due to the rebalancing of production volumes in our U.S. and Taiwan production facilities to address both current market demand for certain products, higher price discounting related to plans to reduce our finished machine inventories and the accelerated phase-out of older product line, higher costs than anticipated on certain turnkey machine projects and product and channel mix changes.

Going forward, we do not anticipate any impact on gross margins as a result of the accounting changes discussed above, however we do anticipate some effect on our gross margin percentage as we continue to phase out older model products and run our factories at lower production volumes to reduce inventory levels. We anticipate these actions to impact gross margin percentage for the first three to six months of 2008.

Gross profit for 2007 increased $7.3 million, or 7%, to $107.4 million, compared to 2006. The primary driver to the gross profit increase is sales volume, predominantly in Europe. For the year, gross margin percentage was 30.1%, down slightly from 30.7% in 2006, and would be approximately 30.6% taking the aforementioned adjustments for prior years into consideration. The after tax impact of the aforementioned adjustments on net income for the year was not significant.

Company selling, general, and administrative (SG&A) expense was $22.4 million for fourth quarter 2007, an increase of $1.2 million, or 6%, compared to $21.3 million for the same period in 2006. SG&A expense as a percentage of net sales was 23.4% for fourth quarter 2007, up from 22.8% for 2006. For 2007, SG&A expense was $84.5 million, an increase of 10%, compared to $77.1 million in 2006. SG&A expense as a percentage of net sales was 23.6% in 2006 and remained essentially the same at 23.7% for 2007, reflecting the Company's increased sales volume. The primary drivers for the increased SG&A expense in 2007 relate to:

the translation of foreign subsidiary financial statements in to US dollars, volume-related commission expenses, additional provisions for bad debt expense, and increased selling and marketing expenses in support of the Company's strategy to invest and strengthen its sales channels.

Interest expense in 2007 was $3.1 million, a decrease of $2.2 million, or 42% from 2006. The decrease reflects the Company's decision to use the proceeds from the sale of $55.9 million of common stock in April 2007 to substantially reduce its long-term debt.

(Emphasis in original).

45.    On this news, the Company's shares declined $4.16 per share, or 25.43 percent, to close on February 21, 2008 at $12.20 per share, on unusually heavy trading volume.

46.    On March 17, 2008 Hardinge filed its Annual Report with the SEC on Form 10-K for the 2007 fiscal year.  The Company's 10-K was signed by Defendants Ervin and Gaio and reaffirmed the Company's financial results announced on February 21, 2008.  The Company's 10-K, in relevant part, stated:

### ITEM 9A.—CONTROLS AND PROCEDURES

*(a)    Managements Evaluation of Disclosure Controls and Procedures*

Management of the Company, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of December 31, 2007. As defined in Rule 13a-12(e) and 15d-12(e) under the Securities Exchange Act of 1934 (the "Exchange Act"), disclosure controls and procedures are controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported on a timely basis, and that such information is accumulated and communicated to management, including the Company's Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. The Company's disclosure controls and procedures

include components of the Company's internal control over financial reporting.

Based upon this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2007, due solely to the material weakness in the Company's internal control over financial reporting as described below in "Management's Report on Internal Control over Financial Reporting." In light of this material weakness, the Company performed additional analysis as deemed necessary to ensure that the consolidated financial statements were prepared in accordance with U.S. generally accepted accounting principles. Accordingly, management believes that the consolidated financial statements included in this report present fairly in all respects the Company's financial position, results of operations and cash flows for the period presented.

## Management's Report on Internal Control Over Financial Reporting

The management of Hardinge Inc. is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision of our Chief Executive Officer and Chief Financial Officer, management conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007 based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, management has concluded, that the Company did not maintain effective internal control over financial reporting as a result of the material weakness that is discussed below.

The material weakness is a result of inadequate controls over the financial statement close process. The Company had several control deficiencies that, when aggregated, constitute a material weakness in the financial statement close process. The control deficiencies related to:

- Review of journal entries booked in consolidation including the entry to eliminate profits in inventory from intercompany transactions
- Analysis and review of certain accrued liabilities
- Review of inventory reconciliations and supporting calculations

The effectiveness of the Company's internal control over financial reporting as of December 31, 2007 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included elsewhere herein.

*Changes in Internal Control*

In light of the material weakness described above, management has performed a review of the Company's internal control processes and procedures surrounding the financial statement close process. As a result of this review, the Company will be taking the following steps to remediate the deficiencies:

- Consolidation entries—The Company will implement reporting procedures from each of its subsidiaries to ensure complete and accurate reporting of intercompany inventory and the related profit on those items. In addition, the Company will strengthen its overall review of the consolidation and related journal entries.
- Review of inventory and accrued liability reconciliations and analyses—The Company will create an accounting policy and procedure manual that will include the required methodology to be used in these analyses as well as the review procedures to be reinforced.
- The Company will maintain evidence as to the effective operation of the new processes and controls so that management is able to assess the operating effectiveness of the Company's controls.

The Company believes that such actions will remediate the material weakness in 2008.

(Emphasis in original).

## UNDISCLOSED ADVERSE FACTS

47.    The market for Hardinge's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Hardinge's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Hardinge's securities relying upon the integrity of the market price of the Company's securities and market

information relating to Hardinge, and have been damaged thereby.

48.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Hardinge's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about the Company, its operations, and prospects as alleged herein.

49.   At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hardinge's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

50.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

51.   During the Class Period, Plaintiff and the Class purchased Hardinge's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities

significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

52.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Hardinge, his/her control over, and/or receipt and/or modification of Hardinge's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hardinge, participated in the fraudulent scheme alleged herein.

53.     Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, on April 25, 2007 the Company completed a  public offering of 2,553,000 shares of Hardinge's common stock at a price of $23.50 per share, for net proceeds to the Company of approximately $56 million.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

54.     The market for Hardinge's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Hardinge's securities traded at artificially inflated prices during the Class Period. During the class period the Company's common stock closed at its highest price of $39.92 per

share on July 19, 2007.   Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Hardinge's securities and market information relating to Hardinge, and have been damaged thereby.

55.   During the Class Period, the artificial inflation of Hardinge's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hardinge's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Hardinge and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

56.   At all relevant times, the market for Hardinge's securities was an efficient market for the following reasons, among others:

(a)   Hardinge stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Hardinge filed periodic public reports with the SEC and the NASDAQ;

(c)   Hardinge regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Hardinge was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

57.    As a result of the foregoing, the market for Hardinge's securities promptly digested current information regarding Hardinge from all publicly available sources and reflected such information in Hardinge's stock price. Under these circumstances, all purchasers of Hardinge's securities during the Class Period suffered similar injury through their purchase of Hardinge's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Hardinge who knew that the statement was false when made.

### FIRST CLAIM
#### Violation of Section 10(b) of
#### The Exchange Act and Rule 10b-5
#### Promulgated Thereunder Against All Defendants

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Hardinge's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

61.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Hardinge's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Hardinge's financial well-being and prospects, as specified herein.

63.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hardinge's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hardinge and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

64.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the

Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

65.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Hardinge's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Hardinge's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Hardinge's securities during the Class Period at artificially high prices and were

damaged thereby.

67.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Hardinge was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Hardinge securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of Hardinge within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.    As set forth above, Hardinge and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

      (d)     Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.

Dated: October 28, 2008

**BLITMAN & KING**

By: _____

Jules L. Smith
The Powers Building
16 West Main Street
Suite 207
Rochester, New York 14614
Telephone:    (585) 232-5600
Facsimile:    (585) 232-7738
E-mail:    jlsmith@bklawyers.com

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone:    (215) 638-4847
Facsimile:    (215) 638-4867

***Counsel for Plaintiff Stanley Weiner***

## SWORN CERTIFICATION OF PLAINTIFF

**Hardinge, Inc., SECURITIES LITIGATION**

I, Stanley Weiner, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase Hardinge, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Hardinge, Inc. during the class period set forth in the Complaint are as follows:

   I bought _600_ shares on _07/12/07_ at $ _31 38_ per share.
   I bought _600_ shares on _07/30/07_ at $ _32 82_ per share.
   I bought _____ shares on __/__/__ at $ _____ per share.
   I bought _____ shares on __/__/__ at $ _____ per share.
   I bought _____ shares on __/__/__ at $ _____ per share.

   I sold _____ shares on __/__/__ at $ _____ per share.
   I sold _____ shares on __/__/__ at $ _____ per share.
   I sold _____ shares on __/__/__ at $ _____ per share.
   I sold _____ shares on __/__/__ at $ _____ per share.
   I sold _____ shares on __/__/__ at $ _____ per share.

   (List Additional Transactions on a Separate Page if Necessary)

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   ___ Check here if you are a current employee or former employee of the defendant Company.

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _10/22/08_

_____
(Please Sign Your Name Above)

**LAW OFFICES OF HOWARD G. SMITH**