```
_____
                           )
IN RE HARDINGE, INC.       )
SECURITIES LITIGATION      )
                           )        08-CV-6490
_____)
                           )        DECISION
This Document Relates to   )        and ORDER
                           )
      ALL ACTIONS          )
_____)
```

### INTRODUCTION

Plaintiffs bring this class-action lawsuit against Hardinge Inc. ("Hardinge" and/or the "Company), J. Patrick Ervin ("Ervin), and Charles R. Trego ("Trego") ("Individual Defendants") (collectively "defendants") pursuant to sections 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).[1] Plaintiffs base their claim on defendants' alleged nondisclosure of certain information during the class period, January 16, 2007 through February 21, 2008 (the "Class Period"). The primary information at issue deals with Hardinge's efforts to add direct sales employees and lessen dependence on distributors in certain regions in an effort to improve the Company's market penetration and increase sales. In addition, plaintiffs plead that the alleged omitted information rendered certain statements that defendants made during the class period misleading. Plaintiffs claim that they purchased Hardinge stock at inflated prices, and suffered

---

[1] Defendants claim that Count I purports to allege violations of Section 10(b) of the Exchange Act and Rule 10b-5 by all defendants, and Count II purports to allege a claim for "control person" liability under Section 20(a) of the Exchange Act.

economic losses when the stock rapidly lost value in 2008 when the true facts were revealed and became known to the market.

Defendants move to dismiss plaintiffs' Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants claim that the plaintiffs' Amended Complaint fails to state a claim upon which relief may be granted. For the reasons set forth below, I hereby grant defendants' motion and dismiss plaintiffs' Complaint with prejudice.

<u>**BACKGROUND**</u>

Unless otherwise noted, the following facts are taken from plaintiffs' Amended Complaint For Violation of the Federal Securities Laws ("Amended Complaint"), including documents incorporated by reference or upon which plaintiffs relied in drafting the Complaint, as well as from public documents which the Company filed with the Securities and Exchange Commission ("SEC").[2]

## I.   The Parties

Hardinge is a global designer, manufacturer, and distributor of machine tools, specializing in precision computer, numerically controlled, material-cutting machines. <u>See</u> Amended Complaint ("Am. Compl.") ¶23. Defendant Ervin was the Chairman of the Board of Directors, President, and CEO of Hardinge during the Class Period. <u>See</u> <u>id.</u> ¶24. Defendant Trego was Senior Vice President and Chief Financial Officer (CFO) of Hardinge during the Class Period. <u>See</u> <u>id.</u> ¶25. Lead

---

[2] <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F3d 147, 152 (2d Cir.2002).

Plaintiff, Paul J. Campbell is an individual who allegedly purchased Hardinge stock during the Class Period. See id. ¶22.[3] Hardinge sold its products worldwide primarily in the United States, Canada, United Kingdom, Germany and China and whose headquarters are located in Elmira, New York. See id. ¶27. In addition, the Company sells its products through a combination of independent distributors, and a direct sales force. See id.

## II. Independent Distributors and Direct Sales

At the beginning of the Class Period, approximately 70% of Hardinge's sales were through distributors and 30% were made through a direct sales force. See id. ¶69.[4] According to the pleadings, in better economic times, i. e., when demand was high for the Company's products, Hardinge increased its direct sales force and decreased use of distributors. This resulted in increased gross margins and profitability. See id. ¶30.[5] When demand constricted, it was more profitable to sell through distributors and layoff direct sales persons, as the Company incurred fewer fixed costs, such as employee salaries, not associated with distributors. See id. As reported in the Company's 2006 Proxy, 2006 was very profitable for the machine tool

---

[3] Plaintiffs claim that they bought the Company's stocks and are suing on behalf of a putative class of investors who purchased publicly traded securities during the Class Period.

[4] Distributors sold the products of Hardinge's competitors as well and took title to Hardinge's products, making a profit by selling the Company's products at prices above the distributors' cost. See id. ¶¶3, 21, 28, 63, 94. In contrast, direct sales persons were employees of Hardinge and were paid both a base salary and commissions on sales of the Company's products. See id., ¶¶28, 63.

[5] Accordingly because salaries and commissions were reported in the "Selling, General, and Administrative" ("SG&A") line of the income statement, SG&A expenses were higher when products were sold through a direct sales force. However, gross margins were lower when selling through distributors. See id., ¶29.

industry as a whole. See id. ¶31. Defendants anticipated that 2007 would be even better than 2006 and forecasted a 20% increase in sales orders in 2007. See id. ¶61. According to plaintiffs the Company wished to take advantage of this perceived increase in demand and decided before the beginning of the Class Period to replace distributors in as many geographic regions as it could with direct sales personnel. See id. ¶¶117, 121. Further, in 2007 in an effort to increase its direct sales presence, Hardinge implemented a pilot program, known as the Juniors Sales Program (the "JSP"), whereby certain new Hardinge employees would be placed with distributors to focus on developing new customer leads for Hardinge products. See id. ¶¶5,95.

## III. Transition to a Direct Sales Force

In an effort to increase market share and improve sales, in late 2006 or early 2007 Hardinge attempted a transition toward a more direct sales-based model in major regions including, but not limited to, the U.S, Canada, and Germany. See id. ¶¶46,54,69,81,83,98. The plaintiffs claim that the Company initially only notified the public of its intentions to "go direct" in Canada via a press release issued January 16, 2007. Also, the press release left the false impression that defendants would maintain and/or increase sales by replacing distributors with "trained and experienced" Hardinge direct sales persons. See id. ¶¶8,46.[6]

---

[6] According to the pleadings, two weeks after the April 25, 2007 secondary offering of the Company's common stock (the "Offering"), sales in Canada were "down 5% in the first quarter" due to moving "from a distributor sales force in Canada to a direct sales force" and, the Company was "currently in the process of setting up our direct operation in Canada[;] it'll take some time to rebuild our penetration in this market." See id. ¶74.

Moreover, there was no mention of the defendants' intention to go direct into any other region or of the risks associated with such a move in the January 16, 2007 release, as disclosed only after the Offering. See id. ¶46. Defendants argue that the press release discussed developments exclusively-related to Canada, without reference to other areas. Plaintiffs claim that confidential witnesses ("CW") informed plaintiffs that the transition was much more expansive. It included, inter alia, the JSP, which had an adverse impact on United States' sales, and the termination of several North American distributors to be replaced by direct sales employees that already was taking place by January 16, 2007. See id. ¶¶93,116-121. The pleadings state that (a) the transition of the North American sales channel had been taking place for the six months prior to the January 16, 2007 announcement; (b) the investments in Germany to transition it to a more direct sales channel had begun in or around the same time as the January 16, 2007 release; and (c) North American sales orders for the first quarter of 2007 were being negatively impacted by the reorganization by at least $2 million. See id. ¶¶75,98.

## IV. Defendants' Statements

Hardinge reported its earnings for the fourth quarter and full-year 2006 on February 22, 2007 and on the same day held a conference call with analysts. See id. ¶¶49,50-54. Hardinge's release stated, inter alia, that "SG&A expense as a percentage of sales continues to decrease as the company is able to leverage against increased sales volume. The primary drivers for that SG&A increase for 2006 as compared to 2005

were volume related commission expense..." See id. ¶49. Accordingly, plaintiffs claim that the release provided no hint of the transition from distributorship to a direct sales force. In fact, it left the opposite impression that more sales were taking place with distributorships and SG&A expenses were up only because demand was up. See id. ¶¶50-51. In addition, Ervin responded to a question by an analyst regarding Hardinge's investment in its Canadian operations, but failed to disclose that there was a transition of the United States and German sales force, including extended training periods for new sales persons. See id. ¶¶52,54. As it relates to the Canadian transition, plaintiff asserts that details were concealed. See id. In addition, defendants failed to disclose that as it relates to its Chinese operations, it was adding untrained factory workers that were adversely affecting production and sales "since the first quarter." See id. ¶95.[7]

## V.    The April 2007 Offering

In April 2007, Hardinge completed a public stock offering, through which the Company raised approximately $55.9 million. See id. ¶7. Hardinge use these funds to pay down debts of the company. See id. ¶¶7,68. The final offering increased the number of shares of the Company's stock issued and outstanding by 2.2 million or more than 25%. ¶¶7,23,66. However, plaintiffs claim that defendants later admitted that the Company made a deliberate "business decision" to build inventory during the transition, knowing that it could not sell the products

---

[7]On February 22, 2007, the Company's stock price closed at $23.13, up $4.08 or over 17%.

during the transition period, resulting in an "inability to generate improved cash flow in the first nine months of 2007 from operating activities [which] has been directly tied to our increase in inventories of $26.3 million." See ¶¶ 42,59,64,73,83,85,92.[8]

Defendant Ervin sold or otherwise disposed of 15,671 shares of the Company's stock on September 4, 2007. See id. ¶126. On the same day, as part of the same transaction, he also exercised options and acquired 26,000 shares of the Company stock. See Declaration of Paul Stecker ("Stecker Decl."), Ex. D. After these transactions, Ervin beneficially owned 110,675 shares of Hardinge stock. See id. On January 3, 2008, Ervin sold or otherwise disposed of 2,135 shares of the Company's stock. See Am. Compl. ¶126., Stecker Decl., Ex. E.

## VI. Hardinge Discloses the Transition and its Impact on Sales Orders and SG&A Expenses

On a conference call with analysts on May 10, 2007, Ervin stated that North American sales were down 5.0% for the first quarter due in part to the Company's transition from distributors to a direct sales force in Canada.[9] In response to a question: "Any other markets you might go direct into?," Ervin responded:

> We will look and determine what is the best method [in a region], whether it's a distributor, and agent or a combination or direct. So that is constantly on our radar screen worldwide to determine what is the best distribution network for our Company...So, I mean yes, always review, I would never say no...

---

[8] Less than 10 months later, the Company's board instituted a $10 million stock repurchase when the Offering's stock price declined by approximately 50% to $12.20 per share. See id. ¶¶98-99.

[9] The first quarter 2007 10–Q and accompanying form 8–K filed the same day failed to disclose the transition or its pending impact on Hardinge. See Am. Compl. ¶¶70-72.

See Am. Compl. ¶78. Plaintiff claims that this statement was false and misleading as defendants knew that there was a Companywide restructuring, transitioning from distributorship to direct sales. See id. ¶79. Further, plaintiffs assert that on August 9, 2007, the Company issued a press release stating that "North American orders decreased due to lower market demand for machine tools as well as the company's decision to terminate several distributors." See id. ¶81. Hardinge also disclosed that the "restructuring actions affected second-quarter orders by approximately $3 million and year-to-date orders by about $5 million." See id. Moreover, in a conference call that took place on the same day, Ervin told analysts that Hardinge was "restructuring [its] North American sales channel," and disclosed that the Company was eliminating sales through distributors in parts of the U.S. and adding direct sales people. See id. ¶¶83,85. In addition, defendants stated that during this transition, the Company "made a business decision not to reduce production as the North American markets slowed," thus the Company had a "$19 million increase in inventories." See id.[10]

On November 8, 2007 Hardinge held the third quarter 2007 earnings call with analysts where Trego stated that the Company's deficient cash flow for the first nine months of 2007 was due to its "increase in inventories of $26.3 million." See id. ¶92. According to plaintiffs it was also the first-time Ervin told analysts about the problems

---

[10]On August 9, 2007, when the Company issued its press release, its stock price closed at $27.25, down $6.17 or 18% from the previous day's close. See id. ¶89.

associated with training people in China who were "coming off the farms" to work in the factories, resulting in Hardinge's Chinese facilities operating at only 40% of their target production levels since "the end of the first quarter" of 2007. See id. ¶95. In addition, Ervin informed analysts that the Company began scaling back production while it built up the sales force, so that it could "start turning that inventory and turning it into cash." See id. Further, Ervin disclosed the Company's efforts to "put some of [its] own people working with distributors in North America," i.e., the JSP. See id. However, in this regard plaintiffs claim that Ervin failed to disclose that the JSP was having an adverse impact on sales and the Company's relationships with its distributors. See id. ¶¶93,117-120. Defendants stated that they were going more "direct" in the U.K. and Germany for the first time as well. See id. ¶95.[11]

Hardinge conducted a conference call with analysts on February 21, 2008 and issued a press release announcing the 2007 fourth quarter and full-year results for the Company. See id. ¶98. Ervin told analysts that the Company was changing back where it was not getting the benefit, when describing the effect of the transition Hardinge had "been making over the last now year or so, 18 months." See id. ¶97.[12] He also stated that: (a) Germany was an area where the Company had been

---

[11]On November 8, 2007, the price of the stock closed at $22.28 per share, down $7.67 from the previous day's close. The following day, the stock fell another $2.06 per share.

[12] While addressing the glaring SG&A increases, non-defendant and corporate controller Gaio, stated that $3.8 million of the $7.5 million increase was "driven by supporting [the Company's] strategy to invest [in] and strengthen [its] sales channels. See id. ¶97.

investing over the last year, and they would continue "to grow and make more of a direct operation;" (b) the Company's distribution model was having an adverse affect on the inventory build; (c) the composition of the North American sales force was still "probably 70% distribution and 30% direct," while the goal was 50-50; and (d) there were "very few, if any, current distributors in the world who could adequately handle the [Company's] current product line." See id.

## VII. Post-Class Period Disclosures

Plaintiffs claim that the Company's public disclosures immediately following the Class Period further revealed the known adverse impact of the sales force "restructuring." ¶¶101-102. On April 10, 2008, Ervin told shareholders in a letter that:

> [T]he strengthened distribution strategy won't occur overnight, and will require some near-term sacrifice as SG&A expenses will increase as we add and train additional sales staff. In addition, it's likely that while this effort continues through the ramp-up phase some sales will be lost as we move through the transition period.

Moreover, Ervin while speaking on the first quarter 2008 earnings call, stated to analysts that at least "25%" of the poor financial results was "self-inflicted," attributable to the change from indirect to direct sales. See id. ¶102.

## VIII.    Allegations of the Amended Complaint

Plaintiffs allege that defendants failed to disclose at the beginning of the Class Period that Hardinge was "transitioning away from primarily selling its products through distributors to direct sales employees in North America and Germany since at least the beginning of the Class Period." See id. ¶2. Plaintiffs also allege that

defendants omitted to disclose certain other information to the market, including production and trade barrier issues in China, the implementation of the pilot JSP, and the causes of an increase in inventory at the Company. See id. ¶¶ 2,5,7. As a result of defendants' omissions, plaintiffs allege numerous statements that defendants made during the Class Period were misleading. See id. ¶¶46-93. Plaintiffs further assert that defendants fraudulently withheld the omitted information because such disclosure would have resulted in a decrease in stock price, and defendants desire to maintain a high stock price to maximize returns from the April 2007 offering by the Company. See id. ¶¶6-7,124. According to the pleadings, sometime after the offering, the omitted information was allegedly disclosed gradually in corporate filings and on quarterly conference calls. See id. ¶¶1,81-100. The alleged disclosures occurred as part of the Company's announcements of its quarterly results for the second, third, and fourth quarters of 2007. See id. ¶¶81-100. Following the announcements of these quarterly results, Hardinge's stock price declined See id.

## DISCUSSION

### I. Defendants' Motion to Dismiss

According to the Supreme Court's most recent pronouncements, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The requirement that the court accept all factual allegations as true does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id. The court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific inquiry" that requires application of "judicial experience and common sense." Id.

The purpose of a motion to dismiss is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." See Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980). The court's inquiry "is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." See United States v. Yale New Haven Hosp., 727 F.Supp. 784, 786 (D.Conn.1990), quoted in In re Xerox Corp. Erisa Litigation, 483 F.Supp.2d 206 (D.Conn. April 17, 2007). In making this inquiry, the court may consider the facts stated on the face of the complaint, as well as in documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken. See Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir.1999). This includes, in securities fraud actions, "public disclosure documents required by law to be filed, and actually filed, with the SEC...." See Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991); Rushing v. Nexpress Solutions, Inc., 2006 WL 2640645, at *3 (W.D.N.Y.2006).

A securities fraud claim such as this one must also satisfy the heightened pleading requirements of the PSLRA and Rule 9(b) by stating with particularity the circumstances constituting fraud. ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir.2009) (citations omitted).[13] To comply with Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.2004). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1),(2).[14]

In Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499 (2007), the Supreme Court established the following procedure that a court must follow when faced with a Rule 12(b)(6) motion to dismiss a Section 10(b) action. First, the court must accept all factual allegations in the complaint as true and must also consider other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions, "in particular, documents incorporated into the complaint by

---

[13]While the pleading rules in federal court require only "a short and plain statement" of the plaintiff's claim for relief, Fed.R.Civ.P. 8, allegations of fraud must be "stated with particularity." See Fed.R.Civ.P. 9(b). In the context of a civil action for securities fraud, this particularity requirement has been expanded by the PSLRA. See 15 U.S.C. § 78u-4.

[14]Because plaintiffs' Rule 10b-5(b) claim requires a showing of scienter, it is subject to the heightened pleading requirements of the PSLRA, which requires plaintiffs "to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." See id.

reference, and matters of which a court may take judicial notice." <u>See</u> <u>id.</u> at 2509. Then, to determine whether the facts in the complaint and in these other sources give rise to a strong inference of scienter, the court must ask whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>See</u> <u>id.</u> at 2510. The court must be careful to consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>See</u> <u>id.</u> at 2509 (emphasis in original).

## II.  Elements of Securities Fraud Claim

Plaintiffs' principal claims are brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, which implements the statute to prohibit "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b) (2008). To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege (1) a material misrepresentation or omission; (2) scienter, i.e. an intent to deceive or defraud; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. <u>See</u> <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005).

However, where oral statements and annual documents and disclosures truthfully disclose the risks of the investment, there is

14

no liability under Section 1934 of the Securities Act. See <u>In re Hyperion Sec. Litig.</u>, 1995 WL 422480 (S.D.N.Y. 1995) (plaintiffs failed to state a claim under Sections 10(b) where investment risks were either disclosed or truthfully represented). Accordingly, "[a] motion to dismiss may be granted upon a determination that all material factual matters have been disclosed to [] purchasers of securities." <u>In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.</u>, 1996 WL 551732 (S.D.N.Y. 1996) (citations omitted); <u>Sable v. Southmark/Envicon Capital Corp.</u>, 819 F.Supp 324 (S.D.N.Y. 1993).

## A. <u>Material misstatements or omissions/non-disclosure</u>.

The first element of a 10(b) claim requires that the defendants made material misstatements or omissions in connection with the sale of securities. Only materially misleading statements or omissions give rise to liability under Section 10(b). See <u>In re DYNEX Capital, Inc. Sec. Lit.</u>, 2009 WL 3380621, at *6 (S.D.N.Y.2009). "For an undisclosed fact to be material, there must be a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" <u>Castellano, v. Young & Rubicam, Inc.</u>, 257 F.3d 171, 180 (2d Cir. 2001) (<u>quoting</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32, (1988) (internal quotation omitted); <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976); <u>see also</u> <u>In re Novagold Res. Inc. Secs. Litig.</u>, 2009 WL 1575220, *16 (S.D.N.Y.2009). Of course, in addition to being material, to form the basis of liability an

affirmative statement must be false and an omitted fact must be true. See In re DYNEX, 2009 WL 3380621, at *6.

It is clear that "[a] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Time Warner, Inc. Secs. Litig., 9 F.3d 259, 267 (2d Cir.1993). Rather, an omission is actionable only when the corporation is subject to a duty to disclose the information. See id. A duty to disclose "arises when disclosure is necessary to make prior statements not misleading." Id. at 268. "A defendant is not required to disclose all known information, but has a duty to disclose any information that is necessary to make other statements not misleading." In re Alliance Pharm. Corp. Sec. Litig., 279 F.Supp.2d 171, 182 (S.D.N.Y.2003); see also Cooperman v. Individual, Inc., 171 F.3d 43, 49 (1st Cir.1999), ("[I]t is clear that an issuer of securities owes no absolute duty to disclose all information. The issue, rather, is whether the securities law imposes on defendants a 'specific obligation' to disclose information of the type that plaintiffs claim was omitted," such as the statutory requirement that the prospectus not omit a material fact "necessary to make the statements therein not misleading.")

Plaintiffs' assertions are based on defendants' alleged nondisclosure of information concerning Hardinge's efforts to increase its direct sales presence in particular areas and certain other information. See Defs. Br. at 7. Plaintiff principally claims that disclosure of the allegedly omitted information was necessary here because a number of statements attributed to defendants were

16

purportedly rendered misleading as a result of the omissions. <u>See</u> <u>id.</u>
Plaintiffs also allege that defendants were required to disclose the
allegedly omitted information because SEC regulations require
disclosure and/or because an insider traded on the basis of material
adverse nonpublic information. <u>See</u> <u>id.</u> Even viewing these facts in the
light most favorable to plaintiffs, the Court finds that defendants'
failure to disclose information relating to increasing its direct sales
presence and decreasing its distributorship operation in certain
regions during the Class Period did not render the Company's statements
misleading.

## 1. **Defendants' statements were not rendered misleading as a result of the alleged omissions**

An omission of information is actionable only where it is
"sufficiently connected to Defendants' existing disclosures to make
those public statements misleading." <u>See</u> <u>In re FBR Inc. Sec. Litig.</u>,
544 F.Supp.2d 346, 356 (S.D.N.Y.2008). Likewise, "Rule 10b-5...holds
parties liable for misleading statements, not merely incomplete
statements." <u>Hoffman v. UBS-AG</u>, 591 F.Supp.2d 522, 535 (S.D.N.Y.2008).
In allegedly misleading statements from the various press releases,
defendants do no more than convey the information which the Company
recently sought to convey and whose accuracy plaintiff has not
challenged. These statements cannot, as a matter of law, be found
misleading for omitting discussion of the allegedly relevant
information. <u>See</u> <u>In re Canandaigua Sec. Litig.</u>, 944 F.Supp. 1202, 1209
(S.D.N.Y.1996) ("plaintiffs point to no statement of the defendants
that could even arguably be rendered misleading by

17

omission....Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information. There is no such duty or obligation");[15] <u>Medis Investor Group v. Medis Tech., Ltd.</u>, 685 F.Supp.2d 136, 143-44 (S.D.N.Y.2008) (statements not misleading, despite alleged omissions, where the "statements convey[ed] exactly what Medis intended," and the truth of the statements was not contradicted).

In addition, the Court rejects plaintiffs' interpretation of the duty to disclose as requiring defendants to disclose all information even tangentially related to the subject matter of a statement. <u>See Glazer v. Formica Corp.</u>, 964 F.2d 149, 154-55 (2d Cir.1992) (As it relates to the materiality of omissions, in order to establish a prima facie case under Rule 10b-5 the plaintiff must show that there was a "'substantial likelihood'" that a "'reasonable investor' would have considered the omitted information significant at the time") (quoting <u>Basic</u>, 485 U.S. at 231-32). Defendants cannot be held liable given that their statements did not affirmatively create an impression that was materially different from the truth. <u>See Brody v. Transitional Hosps. Corp.</u>, 280 F.3d 997, 1006 (9th Cir.2002).

---

[15] The plaintiffs in the <u>Canandaigua</u> case claimed that defendants' pricing strategy gambled "short-term profits and earnings to gain longer-term benefits," and that the defendants were obligated to reveal their marketing strategy but failed to do so, thereby artificially inflating the market price of the company's stock. <u>See Canandaigua</u>, 944 F.Supp. at 1207. Also in <u>Canandaigua</u>, the plaintiffs alleged that the defendants had a duty to disclose to make other statements not misleading. <u>See id.</u> at 1208. The court held however, "the language cited as corporate statements... could not lead any reasonable investor to conclude that Canandaigua was not [implementing its strategy to] introduc[e] new products at discounted prices." <u>See id.</u>

### a. January 16, 2007 Statements

Plaintiffs allege the defendants made a false and misleading statement when the company announced on January 16, 2007 that:

> "[C]anada is one of the largest machine tool markets in the world and we feel that with our significantly expanded product line the best way to support Canadian customers is with our own Hardinge trained and experienced personnel."

See Am. Compl. ¶46-47; Stecker Decl., Ex. G. Significantly, plaintiff does not dispute that Ervin or the Company did "feel" that the best way to support Canadian customers was through having "trained and experienced personnel." In addition, plaintiffs' claimed reasons that Hardinge's statement was false are unavailing. Plaintiffs claim that the statement was false or misleading because "Canadian workers...were being adversely affected by the lack of 'trained and experienced personnel' as fully admitted by defendants at the August 9, 2007 earnings conference call" and because the Company "planned on 'going direct' and eliminating distributors not only in Canada, but also in the United States and Germany and adding direct sales persons worldwide, not later than February 2007." See Def. Br. at 11.

With respect to the first alleged reason, a review of the quoted portions of the January 16 press release demonstrates that defendants made no representations relating to the levels of orders, and accordingly would not be misleading even if plaintiffs had pleaded facts indicating that Canadian order levels had been negatively affected by Hardinge's expansion efforts in Canada. Moreover, assuming as plaintiffs allege that defendants acknowledged in August 2007 that

there had been an adverse effect at some point in time, that does not lead to the conclusion that such effect existed in January 2007 or that defendants were aware of any such effect in January 2007. <u>See Hutchinson v. CBRE Realty Finance, Inc.</u>, 638 F.Supp.2d 265, 273 (D.Conn.2009) (a cognizable claim under the Securities Act requires plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the statement); <u>see</u> <u>also</u> <u>Lin v. Interactive Brokers Group, Inc.</u>, 574 F.Supp.2d 408, 421 (S.D.N.Y.2008).

Further, plaintiffs argue that the January 16 press release was misleading because it did not discuss the Company's alleged intention to increase direct sales capacity in other areas in addition to Canada. <u>See</u> Pl. Opp. Br. at 31. However the press release discussed developments only in Canada, without reference to other areas. No reasonable investor would have been misled by the press release to believe that Hardinge would not seek to increase direct sales capacity in other regions not indicated in the press release. To conclude otherwise would contradict the established rule that the duty to make accurate statements "does not mean that 'by revealing one fact... one must reveal all others that, too, would be interesting...but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.'" <u>In re Bristol Myers Squibb Co. Secs. Litig.</u> 586 F.Supp.2d 148, 160 (S.D.N.Y.2008) (quoting <u>Backman v. Polaroid Corp,</u>, 910 F.2d 10, 16 (1st Cir.1990). Accordingly, no reasonable investor would have interpreted the press release as a representation by Hardinge as excluding any other region.

**b.    February 22, 2007 Statements**

A press release was issued on February 22, 2007 and in addition a conference call was held by Ervin with analysts on the same day.

See Am. Compl. ¶¶49-50. At the conference call, Ervin stated that:

> [W]e'll comment on our fourth-quarter and full-year results, update you on some key operational programs and provide our outlook going forward...

See id. ¶50. Trego also stated that:

> [T]he reduction in gross margin for 2006 resulted from differences in product mix, market mix, and distribution channels. For instance as we have stated previously net sales through distributors generally have lower gross margins but incur lower SG&A expenses compared to net sales by the company's direct sales force or sales agents.

See id. Plaintiffs claim that statements made in the February 22 press release concerning earnings for the fourth quarter and full-year 2006 were false and misleading. See Def. Br. at 12. However, plaintiffs have failed to plead with the required specificity the reasons the statements made in the press release were misleading and accordingly cannot base their securities fraud claim on those statements. See Rombach, 355 F.3d at 174 ("plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so"). The court finds that plaintiffs fail to allege with particularity any actual falsity in defendants' press release.

Further, plaintiff takes issue with Ervin's February 22 introductory statement where he states "we'll comment on our fourth-quarter and full-year results, update you on some key operational

programs and provide our outlook going forward[.]" See Am. Compl. ¶¶50-51. Notwithstanding plaintiffs' claim, this non-substantive introductory statement that Hardinge's representatives would provide information on some programs could not have been interpreted by a reasonable investor to mean that the company would disclose in the conference call any and all marketing and sales strategies that Hardinge might have. See In re Novagold, 2009 WL 1575220, *16. In addition, Trego's comment during the call that sales through distributors generally have had lower SG&A expenses than sales by direct sales agents is similarly non-actionable, as it refers to historical performance, and cannot be reasonably interpreted as a prediction about future SG&A expenses. See Billhoffer v. Flamel Technologies, SA, ---F.Supp.2d----, 2009 WL 3241399 at *7 (S.D.N.Y.2009) ("disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future") (quoting In re Duane Reade Inc. Sec. Litig., 2003 WL 22801416, at *6 (S.D.N.Y.2003)). Moreover, plaintiffs have not alleged that any of the financial information reported was incorrect and as previously stated reporting of historical financial information cannot form the basis of the securities fraud claim. See In re Duane Reade, 2003 WL 22801416, at *6 ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy").

c.  **April 3, 2007 Statements**

Plaintiffs allege that statements made in the April 3, 2007 press release concerning Hardinge's outlook for the year 2007 was misleading

because defendants did not disclose that changes to the Company's sales channels were being made in certain regions and other allegedly omitted information. See Def. Br. at 16; see also Am. Compl. ¶¶60-61, 64. However, Hardinge's statements about its "Outlook" or prospective performance were accompanied by cautionary language. Defendants used words such as "expects" and "guidance" in its "Outlook" to shareholders. See id. ¶61. "Such language brings into play the 'bespeaks caution' doctrine. Under the 'bespeaks caution' doctrine, 'courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial.'" In re Duane Reade, 2003 WL 22801416 at *5 (quoting In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir.1993)). Plaintiffs argue that defendants later "admissions" make the earlier statements i.e. April 3 Outlook, misleading. However, plaintiffs have not pled facts establishing that Hardinge did not have a reasonable basis for making the Outlook statement when made. Further, the Company actually far exceeded its prediction with regard to net sales for 2007, and only missed hitting its target range with respect to net income by less than $80,000.

**d.    Statements relating to the Offering documents**

Plaintiffs argue that defendants had a heightened duty to disclose the reorganization in the Offering documents. See Pl. Br. at 32. In addition, plaintiffs contend that defendants did not even mention the restructuring or warn of its risks and merely incorporated by reference the false and misleading 2007 10-k Item 303 statements and implied that business was as usual, "utilizing both direct and distribution

channels." See id. However, a review of defendants' April 2007 statements relating to the Offering demonstrate that statements were made by defendants making reference to the fact that Hardinge utilizes both the direct and distribution sales channels, which plaintiffs do not dispute, and include nothing inconsistent with an ongoing effort by Hardinge to improve its direct sales presence in certain areas. I find that no reasonable investor would have been misled regarding Hardinge's statements based on a totality of the information. See Castellano, 257 F.3d at 180.

   e.   **May 10, 2007 Statements**

   Plaintiffs contend that defendants' statements made on May 10 stating that the "North American market would have been relatively flat" for the quarter without one particular order and that "SG&A for the first quarter of 2007 was in alignment with [Company] expectations," were false and misleading because defendants left the impression that the first quarter's "transition" resulting in a 5% loss of orders, was limited to Canada. See Pl. Opp. Br. at 33; see also Am. Compl. ¶¶70-74. Plaintiffs next asserts that the statement in Hardinge's Form 10-Q filing for the first quarter of 2007, filed May 10, that "[t]here is no change in the risk factors disclosed in the Company's [2006 10-K]" was materially false or misleading based on the nondisclosure of the Company's efforts to augment its direct sales capacity, the nondisclosure of the Company's decision to increase inventory of products, and the nondisclosure of certain production and trade barrier issues in China. See Am. Compl. ¶¶71-73. Defendants argue

24

that plaintiffs have not pled the falsity of such statements. <u>See</u> Def.
Br. at 18. In addition, defendant contends that a statement that past
SG&A results were "in alignment" with company expectations for a
particular quarter cannot be reasonably interpreted as a representation
or prediction with respect to future SG&A results. <u>See</u> <u>id.</u>

The court finds that plaintiff has not explained why the above
statements were false or misleading. No facts have been pled that would
suggest that defendants' statements were false. <u>See</u> <u>In re DYNEX</u>, 2009
WL 3380621, at *6 (to form the basis of liability an affirmative
statement must be false and an omitted fact must be true). In essence,
plaintiffs' theory is that defendants omitted material facts and issued
misleading "literally true" statements about increasing its direct
sales presence and decreasing its distributorship operation in certain
regions, causing an increase in inventory during the transition period
and production and trade barrier issues in China. <u>See</u> Pl. Opp. Br. at
28,33. However, plaintiffs' argument misses the mark. A defendant has
a duty to disclose material facts, i.e. facts that, if disclosed, would
significantly alter the "total mix" of available information. <u>In re
Take-Two Interactive Sec. Litig.</u>, 551 F.Supp.2d 247, 263 n. 8
(S.D.N.Y.2008) (citing <u>In re Time Warner</u>, 9 F.3d at 267).

Here, reviewing the defendants' allegedly actionable statements in
a light most favorable to the plaintiffs, and in the context of the
information that was available to investors at the time the statements
were made, (as set forth in the Amended Complaint and documents
incorporated therein), I find that plaintiffs have failed to allege any
misstatements or omissions by the defendants that would support a

Section 10(b) claim. Plaintiffs have not pled facts that would support the inference that defendants statements, once they chose to speak, were not "both accurate and complete." See <u>Caiola v. Citibank N.A., New York</u>, 295 F.3d 312, 331 (2d Cir.2000). The pleadings show that changes in circumstances were so significant as of the end of the first quarter that a revision in the list of critical "risk factors" that Hardinge faced was required in order to avoid misleading a reasonable investor. In fact, the Company's strategic purpose in adding to its direct sales capacity in certain areas and increasing its inventory of products was to meet the demands of increased orders resulting from new business. See Stecker Decl., Ex. B, 8/9/07 Conference Call transcript at 2-3, 4-5 ("[W]e are restructuring our North American sales channel to improve our penetration into the market...." and the Company increased inventory because it "want[ed] to be in a position to react quickly to customer demands as we increase our sales as a result of the restructuring of our North American sales force").

### f.  August 9, 2007 Statements

Plaintiff asserts that statements made by defendants during a press release on August 9 were misleading because of omissions made by defendants. See Pl. Opp. Br. at 34. Specifically, plaintiffs claim that statements were misleading because defendants did not disclose that Hardinge was purportedly incurring costs to set up a distribution center in Germany as well as increasing its direct sales capacity there, including initializing the JSP. See Am. Compl. ¶¶81-84. However, the statements made by defendants related exclusively to North American sales and sales channels, and accordingly could not reasonably be

interpreted by a reasonable investor as making any representations with respect to any plans the Company may have had in Germany, let alone a representation that Hardinge was not seeking to increase its direct sales presence in Germany, including nondisclosure of the JSP pilot program. See TSC Industries, Inc., 426 U.S. at 449-450 (Courts must analyze statements in light of the "'total mix' of information" available to the shareholder and determine whether alleged omissions or misrepresentations would be significant to a reasonable shareholder "under all the circumstances"). As stated in previous sections above, the existence of any such pilot program is not inconsistent with any of the defendants' statements about sales, sales channel adjustments, or any resulting effect on sales, and its omission did not cause defendants' statements to be misleading to a reasonable investor. Plaintiffs do not even allege that sales people involved in the JSP "pilot program," whereby certain new Hardinge employees were placed with Company distributors to focus on new accounts, were the only sales employees added by the Company. Indeed the JSP was separate from and in addition to the Company's efforts to increase direct sales capacity. Therefore, because the "total mix" of information available to investors in August 2009 informed investors of Hardinge's restructuring plans as it related exclusively to North American sales and sales channels and not Germany, I find that the allegedly false and misleading statements made by the defendants during the Class Period are not material, in that based on a totality of the information, no reasonable investor would have been misled regarding Hardinge's restructuring.

**g.    November 8 and 9, 2007 Statements**

Plaintiffs' theory of falsity with respect to the November 2007 press releases turns on allegations that Hardinge systematically omitted or failed to disclose information relating to a variety of issues including product offerings, SG&A expenses, inventory levels, and China production issues. See Am. Compl. ¶¶90-93. Defendants dispute the sufficiency of plaintiffs' allegations and contend that plaintiffs' claims provide no ground for a securities fraud claim. See Def. Br. at 27. Based on a totality of the information, the nondisclosure that plaintiffs claim, no reasonable investor would have been misled regarding the Company's restructuring.

Plaintiffs rely upon a purported later admission by Ervin during a February 21, 2008 conference call that defendants' failure to disclose at least part of the inventory build-up was due to the alleged fact that products were being duplicated by the Company and distributors in the same region. However, pleading that Ervin's statement that the Company held duplicative inventory in certain regions at an unspecified time does not satisfy the requirements to plead claims with sufficiency. Plaintiffs have not shown how Ervin's statement relating to duplicative inventory at unspecified times leads to the conclusion that such inventory existed through the end of the third quarter of 2007. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994) (Court rejected allegations as "so broad and conclusory as to be meaningless"). In addition, plaintiffs have not adequately explained how these allegations would support their claim of fraud. See id. (Court found plaintiffs' pleading technique sufficient

to allege that defendants "were wrong," but insufficient to support an inference of fraud and reiterated that "[w]e have rejected the legitimacy of 'alleging fraud by hindsight'") (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978)).

Further, no reasonable investor would consider the statements important, in light of the other disclosures about the existence of inventory issues in that at least some of the inventory buildup was due to Hardinge and a distributor carrying products in the same area. See In re Corning, 2004 WL 1056063, at *8 ("[a]n omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (quoting Halperin v. Ebanker USA.COM, Inc., 295 F.3d 352, 357 (2d Cir.2002) (citation and internal quotations omitted). Accordingly, even if it was true that the Company and its distributors held duplicative products during some or all of the first three quarters of 2007, Ervin's November 9 statement did not address the reasons for the lower than planned orders, thus his statement did not give a fraudulent or misleading reason for the increased inventories. From a business standpoint, there was no good reason to disclose the omitted information. See In re Canandaigua, 944 F.Supp. at 1209 ("Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information. There is no such duty or obligation"). There is clearly no absolute requirement to reveal any business plan considered by a corporation alongside any disclosed plan. See also In re Time Warner,

9 F.3d at 268 ("We do not hold that whenever a corporation speaks, it must disclose every piece of information in its possession that could affect the price of its stock"). Thus, plaintiffs have failed to plead a materially misleading representation or omission on the part of defendants.

## 2. SEC Item 303

Item 303, a registration statement filed by certain issuers in connection with a secondary offering, permits an offeror to incorporate other periodic filings, such as Forms 10-K and 10-Q, by reference. See 17 C.F.R. §229.303(a). In addition, Item 303 provides guidance on what should be included in incorporated forms. See In re Corning, Inc. Sec. Litig., 349 F.Supp.2d 698, 716 (S.D.N.Y.2004). Item 303 requires a registrant to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). In addition, Item 303 focuses on "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. §229.303(a). Plaintiffs must therefore not only plead facts indicating that the alleged known trends existed at the time of the purported misleading statements or omissions (see In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 202 F.Supp.2d 8, 13 (S.D.N.Y.2001) ("The complaint fails to allege that there [were] 'trends' or that they were 'known' as of the date the Prospectus became effective")), but also that the alleged trend or uncertainty was

expected to materially impact the operations or financial conditions of the company within the realm of Item 303 disclosure. See In re Canandaigua, 944 F.Supp. at 1212.

Plaintiffs argue that defendants knew that Hardinge's distribution channels would have material impacts on the trends of sales, gross profits and costs of sales and accordingly defendants had a duty to disclose such trends under Item 303. See Pl. Opp. Br. at 26-27. Under the facts of the present case, plaintiffs have not sufficiently pled a breach of any disclosure requirement under item 303. Although plaintiffs attempt to identify a negative trend resulting from Hardinge's sales channel adjustments, the Company's net sales, income, and orders for 2007 actually increased when compared to 2006. See 2007 Form 10-K at 21,24. Accordingly, plaintiffs cannot credibly argue that the allegedly omitted detrimental information regarding channels of distribution caused Hardinge's reported financial information "not to be necessarily indicative of future operating results or future financial condition." See 17 C.F.R. §229.303(a); See also In re Canandaigua, 944 F.Supp. at 1212 ("It is clear that Canandaigua's competitive pricing policy was not a 'trend or uncertainty' expected to materially impact on 'operations' or 'financial conditions' within the ambit of S-K 303 disclosure").[16]

---

[16]The Canandaigua court stated that Item 303 focuses on trends and uncertainties likely to have a material impact on the "financial condition" or "results of operations," and concluded that strategic decisions such as marketing and pricing plans fell outside the scope of Item 303 disclosure. In addition "courts have been sensitive about forcing a company to damage its own interests as well as those of its shareholders by revealing competitive information." Id. at 1211. Moreover, the court stated that plaintiffs "may not circumvent the settled doctrine that there is no affirmative duty to disclose information by stretching the language of Item 303 beyond its legitimate scope." See id. at 1212.

**B. <u>Scienter</u>**

Plaintiffs' Section 10(b) claim must allege that the defendants acted with scienter. <u>See</u> <u>Novak v. Kasaks</u>, 216 F.3d 300, 306 (2d Cir.2000). The PSLRA requires a plaintiff to plead with particularity facts giving rise to a strong inference of scienter, i.e., the defendant's intent to deceive, manipulate or defraud. <u>See</u> 15 U.S.C. § 78u-4(b)(2); <u>see</u> <u>also</u> <u>Tellabs</u>, 551 U.S. at 313, 127 S.Ct. 2499; <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1467 (2d Cir.1996) ("Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud or at least knowing misconduct"). As the Court held in <u>Tellabs</u>, to constitute a "strong inference," an inference of scienter must be "more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314, 127 S.Ct. 2499. The court must thus take into account plausible opposing inferences." <u>See</u> <u>Tellabs</u>, 127 S.Ct. at 2510. To determine whether a strong inference of scienter is raised, "courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." <u>ECA</u>, 553 F.3d at 198. Thus, a court must ask, "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" <u>Tellabs</u>, 551 U.S. at 326, 127 S.Ct. 2499.

Scienter can be established by alleging sufficient facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior

or recklessness. See ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir.2007) (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir.2000)); see also Shields, 25 F.3d at 1128; San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 813 (2d Cir.1996); Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995). "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." See In re Sotheby's Holdings, Inc., 2000 WL 1234601, at *7 (S.D.N.Y. 2000); see also In re Winstar Commc'ns, 2006 WL 473885, at *7 (S.D.N.Y. Feb.2006).

"In addition to actual intent...recklessness is a sufficiently culpable mental state in the securities fraud context." See Dynex, 2008 WL 2521676, at *3. Recklessness requires a showing of "reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents extreme departure from standards of ordinary care." See SEC v. McNulty, 137 F.3d 732, 741 (2d Cir.1998). "[A]n allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness." See Hart v. Internet Wire, Inc., 145 F.Supp.2d 360, 368 (S.D.N.Y.2001) (quoting Troyer v. Karcagi, 476 F.Supp. 1142, 1152 (S.D.N.Y.1979)); see also In re Bayou Hedge Fund Litig., 534 F.Supp.2d 405, 415 (S.D.N.Y. 2007). Even an "egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts." See Hart, 145 F.Supp.2d at 368-69 (internal quotation marks and citations omitted).

1.  **Motive and Opportunity to Commit Fraud**

a.  **Individual Defendants**

To allege defendants' motive sufficient to raise a strong inference of scienter, plaintiffs must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Shields, 25 F.3d at 1128. "General allegations that defendants acted in their economic self-interest are not enough." Ganino, 228 F.3d at 170. In this case, plaintiffs rely on Ervin's disposition of his shares of stock during the Class Period as a way to allege motive. Ervin sold or otherwise disposed of 15,671 shares of the Company's stock on September 4, 2007. See Am. Compl., ¶126. However, "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter." In re Bausch & Lomb, 592 F.Supp.2d at 334. Rather, to satisfy this element, plaintiffs must establish that the sales were "unusual" or "suspicious." See, e.g., Acito, 47 F.3d at 54; In re Health Mgmt. Sys., Inc. Sec. Litig., 1998 WL 283286, at *6 (S.D.N.Y.1998) ("Unusual insider trading activity during the class period may permit an inference of scienter; however, plaintiffs bear the burden of showing that any such sales are in fact unusual").

In this case, plaintiffs' allegations fail to raise the requisite strong inference of scienter based on the Individual Defendants' motive and opportunity. First, plaintiffs fail to explain how Ervin's September 2007 stock transaction was "unusual" or "suspicious." See Acito, 47 F.3d at 54. Indeed, plaintiffs have not been able to counter the most critical fact concerning Erwin's stock transaction on that day

i.e. that he disposed of the largest amount of stock (15,671 shares), he "sold" his shares to the Company and as part of the same transaction, he acquired 26,000 shares of the Company stock through the exercise of stock options.[17] See <u>Anderson v. Abbott Labs.</u>, 140 F.Supp.2d 894, 910 n. 11 (N.D. Ill.2001), *aff'd sub nom.* <u>Galligher v. Abbott Labs.</u>, 269 F.3d 806 (7th Cir.2001) (selling of shares to cover the costs associated with the exercise of stock options "is a 'sale' in name only," and "does not create the same appearances, and therefor[e] should not carry the same implications as an insider selling in the open market"). Accordingly, it is not credible for plaintiff to claim that Ervin's stock transactions support an inference that he was divesting himself of shares based on materially adverse, non-public information when he acquired more shares than he disposed of on the day in question. <u>See</u> <u>Malin v. XL Capital Ltd.</u>, 499 F.Supp.2d 117, 154-55 (D.Conn.2007) (stock sales were not indicative of scienter where defendants' "stock acquisitions more than offset their sales").

Second, total sales amounting to a relatively low percentage of an insider's percentage of stock holdings militate against an inference of scienter. <u>See</u>, <u>e.g.</u>, <u>Acito</u>, 47 F.3d at 54 (sale of 11% of defendant's holdings not unusual); <u>In re Corning</u>, 2004 WL 1056063, at *28 ("A sale of less than 15% of one officer's stock holdings in the company does not raise a strong inference of scienter on the part of either the officer of the company to defraud investors); <u>In re Glenayre Techs., Inc. Sec. Litig.</u>, 1998 WL 915907, at *4 (S.D.N.Y.1998) (no inference of

---

[17] <u>See</u> Stecker Decl., Ex. D.

scienter where sales represented 5% of cumulative stock holdings); In re Health Mgmt., 1998 WL 283286 at *6 & n. 3 (sales during class period ranging from 3% to 81.9% of holdings not suspicious when viewed in light of other relevant factors). Here, the stock transactions involving the amount of stock disposed by Ervin during the Class Period, alleged to be 14% of his holdings (see Am. Compl. ¶126), do not support an inference of scienter. Thus, plaintiffs have not carried their burden of pleading that Ervin's stock transactions support an inference of scienter based on motive.

Further, plaintiffs claim that the Individual Defendants were under a unique and specific pressure to perform, which created a motive sufficient to support an inference of scienter. See Pl. Opp. Br. at 20. This claim is meritless given that the pressure to perform is commonplace in corporations whose officers have a responsibility to generate profits for shareholders. Since plaintiffs may not "proceed based on motives possessed by virtually all corporate insiders," plaintiffs allegations are insufficient to raise an inference of scienter. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir.2008) (quoting Novak, 216 F.3d at 307); see also Kalnit v. Eichler, 264 F.3d 131, 140 (2d Cir.2001) ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers"); In re Sotheby's, 2000 WL 1234601 at *7 ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent

36

conduct based solely on their board membership or executive positions are insufficient to plead scienter").

Likewise, in <u>In re Axis Capital Holdings Ltd. Sec. Litig.</u>, 456 F.Supp.2d 576, 593-94 (S.D.N.Y.2007), the court held that "the law is clear that the desire of individual defendants to keep their jobs or increase their compensation by artificially inflating... stock price" is not sufficient to establish motive." Applying the <u>In re Axis</u> principle to the present case leads to the conclusion that plaintiffs' claim concerning Trego's alleged desire to keep his position in order to benefit from vesting stock in incentive compensation does not plead motive. <u>See</u> Pl. Opp. Br. at 21-22. Moreover, as it relates to the purported scienter of the Individual Defendants, plaintiffs' contend that the Individual Defendants' knowledge of wrongdoing is demonstrated by their departures from Hardinge after the Class Period. <u>See</u> <u>id.</u> The Court finds that plaintiffs have failed to adequately plead scienter regarding any of the securities fraud claims, alleging merely that the Individual Defendants left the Company without articulating any facts that the Individual Defendants wished to conceal prior wrongdoing. This failure to properly plead scienter provides an independent basis for dismissing plaintiffs' fraud claims. <u>See</u> <u>Kalnit</u> 264 F.3d at 139; <u>Ganino</u>, 228 F.3d at 170.

b.   **Corporate Defendants**

Plaintiffs' allege that Hardinge's motives included pricing the April 2007 offering at as high a price as possible to pay down its debt, finance anticipated inventory buildups because of the reorganization, and complete its acquisition of the Canadian operations

by the second quarter of 2007. See Am. Compl. ¶¶ 68,70,83,85; see also Pl. Opp. Br. at 23. In addition, plaintiffs' claim that the corporate motives are more specific than the Individual Defendants' motives. See Pl. Opp. Br. at 23. The court finds that plaintiffs' arguments are without merit. In In re Corning, the court held that a plaintiff's "allegations concerning [a defendant corporation]'s attempt to boost stock prices to maximize the proceeds of [its] offering falls into the category of a generalized motive to maximize profitability and is therefore insufficient to meet the requirements of the PSLRA to raise a strong inference of scienter." See 2004 WL, at *27. Accordingly, plaintiffs have insufficiently pled motive based on Hardinge's April 2007 Offering.

Further, Hardinge indicated that it intended to and did use the proceeds from the Offering to pay down corporate debt. See Am. Compl., ¶ 68. However, a corporation's desire to manage debt does not provide a particularized motive supporting an inference of scienter. See In re GeoPharma, Inc. Sec. Litig., 411 F.Supp.2d 434, 443 (S.D.N.Y.2006) ("[C]ourts in this Circuit have consistently held that allegations that a defendant was motivated to commit securities fraud by a desire to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference"). Plaintiffs also contend that the Company had motive to fraudulently inflate the stock price because it intended to use the proceeds from the Offering to "finance anticipated inventory builds" or complete Hardinge's acquisition of a Canadian distributor for $300,000. See Pl. Opp. Br. at 23. Again, for the reasons already discussed above, the court finds that these claims

lack factual support and are conclusory. See In re GeoPharma, 411
F.Supp.2d at 450-51.

## 2. Recklessness

When plaintiffs are unable to make the "motive" showing, they
might nonetheless raise a strong inference of scienter under the
"strong circumstantial evidence" prong, "though the strength of the
circumstantial allegations must be correspondingly greater" if there is
no motive. See Kalnit, 264 F.3d at 142 (citation omitted). To survive
dismissal under this prong, plaintiffs "must show that they alleged
reckless conduct by the [defendants], which is at the least, conduct
which is highly unreasonable and which represents an extreme departure
from the standards of ordinary care to the extent that the danger was
either known to the defendant or so obvious that the defendant must
have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220
F.3d 36, 39 (2d Cir.2000). To state a claim based on recklessness,
plaintiffs may either "specifically allege defendants' knowledge of
facts or access to information contradicting defendants' public
statements, or allege that defendants failed to check information they
had a duty to monitor." Montoya v. Mamma.Com Inc., 2006 WL 770573, at
*5, at *17-18 (S.D.N.Y.2006) (quoting Novak, 216 F.3d at 311).

Even assuming that plaintiffs have adequately pled defendants'
knowledge of the efforts to increase Hardinge's direct sales capacity
in certain regions or other allegedly undisclosed information, and
nonetheless did not disclose such information for part of the Class
Period, that is not sufficient to raise a strong inference of scienter
here. Where plaintiffs contend defendants had access to contrary facts,

they must specifically identify the reports or statements containing this information to indicate how it was inconsistent with the statements made. See <u>Montoya</u>, 2006 WL 770573 at *5; <u>see</u> <u>also</u> <u>Teamsters</u>, 531 F.3d at 196; <u>Ressler v. Liz Claiborne, Inc.</u>, 75 F.Supp.2d 43, 52 (E.D.N.Y.1998) ("To withstand a motion to dismiss, a plaintiff must detail specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question"), aff'd, 189 F.3d 460 (2d Cir.1999).

Importantly, the Second Circuit has "refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant;...[t]hus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim for securities fraud." <u>Novak</u>, 216 F.3d at 309. Moreover, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." <u>Id.</u> When all of the facts are taken together, a reasonable person would consider a non-fraudulent explanation for defendants' actions to be more likely than the inference that any defendant act with reckless intent to defraud. Accordingly, the allegations surrounding defendants do not give rise to any inference of scienter.

### 3.  Comparison to Plausible Opposing Inferences

In light of the foregoing, I will turn to the considerations spelled out in <u>Tellabs</u> and consider the "whether *all* of the allegations, taken collectively, give rise to a strong inference of

scienter" and whether, in comparison to "plausible opposing inferences," the inference that defendants acted with scienter is "at least as compelling as any opposing inference." <u>Tellabs</u>, 129 S.Ct. at 2509-10. In arguing against the cogency of plaintiffs' inference of scienter, defendants have offered (as discussed above) several substantive arguments about why plaintiffs' theory of securities fraud does not add up. In fact, the most likely inference from the facts alleged is that defendants did not make certain disclosures concerning production and trade barrier issues in China, the implementation of the pilot JSP, and the causes of an increase in inventory at the Company, because they believed that they were under no obligation to do so, and that, from a business standpoint, there was no good reason to disclose the omitted information. Accordingly, when all of the facts are taken into account, a reasonable person would consider a non-fraudulent explanation for defendants' action to be more likely than the inference that any defendant acted with the requisite intent to defraud or recklessness. <u>See ATSI Commc'ns</u>, 493 F.3d at 99; <u>see also</u> <u>Medis</u>, 586 F.Supp.2d at 148 ("The Court finds the inference of recklessness alleged by Plaintiff – that Defendants knew or should have known that Medis's statements...were false and/or misleading – is less compelling than opposing inference – that any inaccuracy was, at best, a product of Defendants' negligence.") For the foregoing reasons the Amended Complaint does not adequately allege facts that give rise to a strong inference of scienter.

**III. Section 20(a) Claims**[18]

To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator of the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." See ATSI, 493 F.3d at 108; In re Alstom SA Sec. Litig., 454 F.Supp.2d 187, 209 (S.D.N.Y.2006) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show, inter alia, a primary violation by a controlled person.") (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.1998); see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F.Supp.2d 210, 230-31 (S.D.N.Y.2008). Because the Amended Complaint fails to allege a primary violation by a controlled person, defendants' motion to dismiss the § 20(a) claim is granted.

## CONCLUSION

For the reasons set forth above, I grant defendants' motion to dismiss plaintiffs' Amended Complaint with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

_s/Michael A. Telesca_
MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          February 2, 2010

---

[18]Section 20(a) may be used to impose joint and several liability upon a person who controls another person who violates Rule 10b-5(b) or certain other provisions of the securities laws. Section 20(a) calls the person who directly violates Rule 10b-5(b) the "controlled person" or "primary violator"; the "primary violator" is said to have committed a "primary violation." See 15 U.S.C. § 78t(a).